

12 CIV 4778

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MATTHEW PINSLY, derivatively on
behalf of BANK OF AMERICA
CORPORATION,

                      Plaintiff,

v.

CHARLES O. HOLLIDAY, JR.,
MUKESH D. AMBANI, SUSAN S. BIES,
FRANK P. BRAMBLE, SR., VIRGIS W.
COLBERT, CHARLES K. GIFFORD, D.
PAUL JONES, JR., MONICA C.
LOZANO, THOMAS J. MAY, BRIAN T.
MOYNIHAN, DONALD E. POWELL,
CHARLES O. ROSSOTTI, ROBERT W.
SCULLY, JOSEPH L. PRICE, ALVARO
G. DE MOLINA, AMY WOODS
BRINKLEY, BARBARA J. DESOER,
AND KENNETH D. LEWIS,

                      Defendants,

and

BANK OF AMERICA CORPORATION,

                Nominal Defendant.

Case No.

**JURY TRIAL DEMANDED**

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.    Plaintiff Matthew Pinsly ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Bank of America Corporation ("BOA" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and the Company's and/or its subsidiaries' executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2005 to the present (the "Relevant Period").

### NATURE OF THE ACTION

2.    BOA is a Delaware corporation headquartered in Charlotte, North Carolina.

According to its public filings, BOA is one of the world's leading financial firms and largest banks in the U.S. by assets. The Company provides a range of banking and nonbanking financial services and products in the U.S. and internationally. The Company and its stockholders have experienced a tremendous debacle since 2008.

3.      Throughout the Relevant Period, through their actions and inactions, defendants breached their fiduciary duties by exposing the Company to a vast number of serious problems, exposures, and liabilities, which are detailed herein. These myriad problems have caused BOA to suffer monumental damages, yet the Board has not sought to hold a single individual accountable for these damages.

**A.      <u>Subprime Exposures</u>**

4.      Historically, some of the defendants held themselves out as "visionaries" with respect to the underlying toxic capacity of subprime real estate loans, but, sadly, there was no courage behind that purported conviction. More specifically, on August 15, 2001, defendants, with much flourish, publicly announced that BOA was exiting its subprime real estate lending businesses because they did "not fit the company's strategic and profitability objectives." According to BOA's then-Chairman and Chief Executive Officer ("CEO"), Kenneth D. Lewis ("Lewis"), "[w]e have said for some time that if a business cannot be configured to drive what we believe are consistent, attractive results, we would exit it. *[This] business[] ha[s] very volatile earnings streams, ha[s] become unattractive from a risk reward standpoint and ha[s] not produced required rates of return.*"[1] The August 15, 2001 press release further stated:

> *The profitability of the subprime real estate lending business is not commensurate with the associated risk.* The company took actions to improve the profitability of this business; however, these improvements have not eliminated concerns about earnings volatility, future credit risk and higher operating costs. New [subprime

---

[1]      Emphasis is supplied unless otherwise noted.

loan] originations will cease immediately. The company intends to liquidate its $26.3 billion subprime portfolio over the next seven to nine months...

5.      Despite this unequivocal statement to shareholders' cataclysmic detriment, there was no courage behind Lewis's (and/or the Board's) purported conviction. Although BOA "exited" the subprime mortgage loan origination business during the third quarter of 2001, it continued to periodically purchase subprime mortgages from third party loan originators for the purpose of pooling them with "Alt-A" loans,[2] mid and prime residential mortgages, and other loan products (including home equity loans ("HEL")), which it then securitized (principally through its limited purpose affiliate, Asset Backed Funding Corp.) as collateralized debt obligations ("CDOs") for sale to investors.[3] While BOA only conducted (on average) three such CDO offerings per year between 2002 and 2004, beginning in 2005, the Company substantially increased its CDO underwriting production to 9 offerings, followed by 10 new CDO offerings in 2006.

6.      For each of the 2005 and 2006 CDO offerings, BOA retained "super senior" interests in both "mezzanine" and "high grade" portions of these CDOs. A mezzanine CDO is created by pooling together junior tranches (such as BBB and sub-BBB rated) of subprime residential mortgage-backed securities ("RMBS") and other loan-based assets. This asset concentration means that a relatively small rise in underlying pool losses will simultaneously destroy most of the value of the mezzanine CDOs and negatively impact the super senior

---

[2]      The term "Alt-A" is shorthand for "Alternative to Agency," which historically meant loans not meeting the published standards of Freddie Mac or Fannie Mae. An Alt-A loan falls just above subprime status, but still below that of a "prime" loan because of deficiencies in the borrower's credit profile. For example, a borrower typically does not provide complete documentation of his assets or the amount or source of his income.

[3]      Subprime and Alt-A residential loans are extended to borrowers who do not qualify for standard loans, or otherwise lack the qualifications (or loan documentation) necessary to secure a prime-rate mortgage. Such loans are inherently more risky than mortgages backed by conforming/fully documented loans.

tranches.  Further, the value of BOA's subprime/Alt-A/HEL derived CDOs directly correlated to the strength (or weakness) of the U.S. housing market.

7.      In fact, by year-end 2007, in a vain effort to get in on the gold rush, defendants increased BOA's net exposure from such instruments to approximately *$11.63 billion* of the very same volatile subprime mortgage instruments that defendants previously denounced and which they were supposedly eradicating in mid-2001 *"because they do not fit the company's strategic and profitability objectives."*  These and other highly risky investments were material to BOA's financial condition and concomitantly impacted the Company's Tier 1 capital and leverage ratios, which, as discussed here, eventually brought the Company to its knees during the worldwide economic meltdown in 2008.

8.      Defendants' rush -- without designing and implementing commensurate controls -- into to the subprime market was not the only extremely risky bet placed (with stockholder money) without adequate investigation and internal controls.

**B.      The Failed Countrywide Acquisition**

9.      In addition to the Company's massive subprime exposure, in August 2007, defendants caused the Company to announce that it had made a $2 billion convertible preferred stock investment in Countrywide Financial Corporation ("Countrywide"), the highly-troubled yet then largest mortgage lender in the U.S.  The convertible nature of this transaction provided BOA with a 16% equity stake beneficial interest in Countrywide.  Defendants also reported the transaction in a subsequent Securities and Exchange Commission ("SEC") Form 10-Q for the third quarter ended September 30, 2007.

10.      On January 11, 2008, purportedly after completing thirty (30) days of "extensive due diligence" involving over sixty (60) BOA personnel, defendants announced pursuant to a

Form 8-K filing that BOA had reached a definitive agreement to purchase deeply-flawed Countrywide for approximately *$4 billion* worth of BOA common stock (the "CW Acquisition"). Countrywide's stock was trading hands for approximately $7 per share on the date of the announcement, which was approximately an 85% decline from its price two years earlier. Defendant Lewis, BOA's then-Chairman and CEO, publicly touted the CW Acquisition as a "*once in a lifetime opportunity*" for BOA to become the top mortgage originator and servicer in the nation.   The CW Acquisition closed on July 1, 2008.

11.    Defendants' public representations regarding BOA's alleged "extensive due diligence" omitted any references to severe existing problems concerning the liabilities attendant to Countrywide's financial condition and systemic failure to follow proper mortgage lending and underwriting practices from 2005-2007.   As BOA spokesman Robert Stickler stated on June 8, 2008 regarding the CW Acquisition: "*We understood that there was a black hole from here to there and that Countrywide was going to go through some financial difficulties.   The question was, how big is the hole.*"

12.    Throughout the Relevant Period, however, rather than come clean regarding the Company's true Countrywide exposure, defendants: (i) failed to disclose that the Company's loans, leases, CDOs and commercial mortgage-backed securities were impaired to a far-greater extent than previously reported;[4] (ii) misrepresented the extent of the impaired assets by failing to establish adequate reserves or properly record losses for its impaired assets; (iii) misrepresented the adequacy of the Company's internal controls in light of the alleged impairment of its assets; (iv) misrepresented the Company's capital base and Tier 1 leverage

---

[4]     The Company also became the subject of numerous putative class actions based on certain offerings of Countrywide regarding mortgage-backed securities.  In particular, these class actions related to 429 offerings that took place between January 2005 and December 2007.

ratio for risk-based capital in light of the allegedly impaired assets; and (v) misrepresented the thoroughness and adequacy of the Company's due diligence in connection with its acquisition of Countrywide.

13.     Indeed, *Bloomberg.com*, in an article published on July 20, 2011 entitled "Curse Those Who Gave Us Bank of America" (the "Bloomberg Article"), noted that *as late as the end of 2010*, defendants "still clung to the position that none of the $4.4 billion of goodwill from [BOA's] 2008 purchase of Countrywide Financial Corp. had lost a dollar of value." Accordingly, by as late as the end of 2010, the effects of the CW Acquisition remained hidden from shareholders.   As alleged further herein, of course, Countrywide was an unmitigated disaster for BOA, as it has cost it over $20 billion; it is one of the most destructive acquisitions ever perpetrated on U.S. stockholders.

14.     The disastrous effects of the CW Acquisition continue to plague the Company (and its stockholders).   For instance, in January 2011, defendants were forced to write off *$5 billion* in bad loans issued by Countrywide.   This $5 billion was in addition to the nearly $5 billion previously written off concerning Countrywide.   Thus, the $4 billion CW Acquisition has resulted to date in write-offs totaling (at least) nearly *$10 billion,* and this does not include the ongoing material exposures the Company faces stemming from the CW Acquisition.

15.     In addition to proving disastrous for the Company's financial results and condition, because the CW Acquisition drastically increased the Company's exposure to the subprime market, the CW Acquisition also roped the Company into very costly litigation.   In particular, beginning on or about August 14, 2007, multiple class action complaints were filed in the U.S. District Court for the Central District of California, which were eventually consolidated and captioned *In re Countrywide Fin. Corp. Sec. Litig.*, No. CV 07-05295 MRP (MANx) (C.D.

Cal.) (the "Countrywide Action"). The plaintiffs in the Countrywide Action asserted claims under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") against Countrywide, certain of its current and former directors and officers, its outside auditor KPMG LLP ("KPMG"), and underwriters of public offerings of Countrywide securities. Specifically, the plaintiffs alleged, *inter alia,* that the defendants violated the federal securities laws by making false and misleading statements concerning Countrywide's business as an issuer of residential mortgages, the creditworthiness of borrowers, underwriting and loan origination practices, and loan loss and other accounting provisions. The plaintiffs further alleged that the defendants misrepresented high risk low documentation loans as being "prime," in violation of generally accepted accounting principles ("GAAP").

16.     After nearly three years of costly litigation, on May 7, 2010, the plaintiffs to the Countrywide Action announced a proposed settlement of the action for *$624 million* in cash. On March 10, 2011, the settlement was granted final approval.

17.     More recently, on June 29, 2011, defendants caused the Company to announce that it had likewise agreed to pay *$8.5 billion* to settle other Countrywide-related claims arising from the sale of poor-quality mortgage-backed securities that were designed to (and did quickly thereafter) implode shortly after they were sold to unsuspecting investors (the "MBS Settlement"). These claims were initially brought by a group of 22 of the largest and most powerful institutional investors in the U.S., including the Federal Reserve Bank of New York, Pimco Investment Management, MetLife, Inc., and Blackrock Financial Management. These investors had alleged in a letter sent nine months earlier to BOA that the securities they purchased before the financial crisis (originally valued at $105 billion) were impermissibly loaded with time-bomb loans that did not meet the sellers' promises about the quality of the

borrowers or the collateral.   The investors also alleged that Countrywide failed to maintain accurate files while managing the loans.   Eventually, the investors' group expanded to cover 530 bond deals originally valued at $424 billion.

18.     The MBS settlement, which, upon information and belief, remains subject to approval by the New York State Supreme Court,[5] would be the largest settlement by any financial-services firm in history, and would exceed the total profits of BOA since the onset of the financial crisis in 2008.[6]

19.     All told, Countrywide has cost the Company at least $20 billion (and perhaps more), yet the Board has not so much as handed a speeding ticket to any officer, director or employee connected to the CW Acquisition.

## C.     The Company's Equally Bad Merrill Lynch Acquisition

20.     In addition to the Company's multiple, severe exposures described above, the Board made yet another risky bet close in time to the most tumultuous period of the worldwide financial crisis when it determined to acquire Merrill Lynch & Co., Inc. ("Merrill") for approximately $29 per share (valuing Merrill at $50 billion), pursuant to an Agreement and Plan of Merger (the "Merger Agreement") between Merrill and BOA, dated as of September 15, 2008 (the "Merger").   Like Countrywide, Merrill's brand was obviously well-known, but also like Countrywide, this was no "bargain" for BOA, because Merrill was in grave danger of evaporating; by September, 2008, the once-venerable Merrill was experiencing a classic "run-on-

---

[5]     Objections have been filed to this MBS Settlement, and if the objectors are successful, resolving this dispute could cost BOA more, much more, than the $8.5 billion it has already pledged to settle these claims

[6]     From 2008-2010, BOA stockholders' total earnings per share have actually been negative $0.10.   Further, the Company's combined net income from 2008-2010 is only approximately $8 billion.

the-bank" and its stock price had followed suit, losing an incredible nearly 50% of its value from June 2008 until September 2008. The Merger was publicly announced on September 15, 2008. The vote of BOA stockholders to authorize and issue BOA stock to effect the Merger occurred on December 5, 2008 and it was approved by both companies' stockholders on January 1, 2009. The Merger was yet another "fire purchase" by defendants in the heat of the financial crisis, which was caused, in fact, by the extremely risky conduct by defendants and other would-be "Wizards of Wall Street."

21.     As a result of the Merger, Merrill became a wholly-owned subsidiary of BOA and Merrill's former stockholders received 0.8595 shares of BOA stock for every share of Merrill stock; approximately 25% of the newly-combined company. Critically, during January 2009, the price of the Company's stock traded for as low as approximately $6.20 per share, making the acquisition of Merrill very dilutive of the Company's stock. Prior to the announcement of the Merger, as alleged herein, many of Merrill's serious problems (and some of its potential exposures) were already well-known to the market and to defendants.

22.     For instance, leading up to the Merger Agreement, Merrill faced substantial uncertainty with respect to its capital funding, liquidity, and business viability as a result of its over-aggressive investment in tens of billions of dollars' worth of "toxic assets" -- or CDOs[7] -- and the subsequent substantial negative impact of the subprime mortgage crisis on Merrill's business. It was against that backdrop that defendants agreed, over the period of *merely three days*, to save Merrill from bankruptcy by entering into the Merger, thereby exponentially compounding BOA's own risk exposure by acquiring Merrill's problems in exchange for then-valuable BOA stock. The Merger was, in effect, a gift bestowed on Merrill stockholders by the

---

[7]     CDOs are merely a well-disguised variant of the kind of subprime exposure that Lewis specifically warned against seven years earlier.

Board.

23.     On Friday, September 12, 2008, the top executives of Wall Street's largest investment firms (the very engineers of the crisis) and the Federal Reserve Bank (the "Fed") busied themselves preparing for the likely bankruptcy of the then-oldest giant on Wall Street, Lehman Brothers, Inc. ("Lehman"). By Saturday morning, September 13, 2008, in the midst of ongoing meetings at the Fed discussing contingency plans in preparation for Lehman's demise, Merrill's then-CEO, John Thain ("Thain"), realized that if he did not act immediately, in a week's time Merrill would likely be in the same predicament as Lehman, because Merrill's access to the credit markets was rapidly disappearing   In an effort to save Merrill, Thain immediately reached out to Lewis, BOA's then-Chairman and CEO, to discuss a "strategic transaction" between Merrill and BOA.

24.     During a hastily arranged meeting between Thain and Lewis in New York on Saturday afternoon, September 13, 2008, Thain offered to sell BOA a 9.9% stake in Merrill. Lewis, however, responded that BOA was only interested in purchasing 100% of Merrill.  A mere day later, on the evening of September 14, 2008, defendants agreed to acquire Merrill for $50 billion and to pay Merrill stockholders an astounding 70% premium for their shares, despite the fact that Merrill was on the brink of bankruptcy, and after having performed a mere *31 hours* of due diligence prior to agreeing to the  Merger.

25.     BOA stockholders voted to approve the stock authorization on December 5, 2008. Critically, by the time of the December 5, 2008 vote, defendants knew or should have known, and failed to disclose, that Merrill had incurred billions of dollars in losses beyond what was forecast by BOA on September 15, 2008.

26.     From September 15, 2008 through early December 2008, Merrill's financial

condition deteriorated rapidly as it continued to incur billions of dollars in losses. With access to Merrill's daily profit and loss statements, defendants, who had conducted weekly conference calls starting in September 2008, were aware of these losses and began to question whether BOA should exercise its right to terminate the Merger as the December 5, 2008 stockholder vote approached and Merrill's pretax losses climbed to *$14 billion*.

27.    By the December 5, 2008 stockholder vote on the merger defendants, along with BOA's in-house and outside counsel, were locked in a debate over whether Merrill's losses were so severe that BOA should cite the "material adverse effect" clause (commonly known as "material adverse change" clause or "MAC") in the Merger Agreement and terminate the Merger. In a truly astonishing breach of fiduciary duty (even by Wall Street standards), none of this highly-material information was disclosed to BOA stockholders in order to adequately inform their votes.

28.    Likewise, in breach of their fiduciary duty of loyalty, defendants deliberately chose not to supplement the Proxy Statement filed by BOA on October 31, 2008 (the "Proxy") or renegotiate the Merger terms. Instead, defendants allowed BOA stockholders to vote to approve the Merger and allowed the Merger to close without informing them that: (i) Merrill could collapse at virtually any time; (ii) from the time the Merger Agreement was signed until the Proxy was issued, Merrill's financial condition deteriorated dramatically and was continuing to deteriorate on a daily basis because of the multi-billion dollar losses Merrill was continuing to incur; (iii) Merrill's losses had increased so rapidly and by such an amount that BOA considered exercising its contractual right to declare the occurrence of a MAC under the Merger Agreement; (iv) BOA required $20 billion from the Troubled Asset Relief Program ("TARP") in order to close the Merger, which the U.S. Treasury secretly agreed to provide to BOA; (v) in order to

obtain $20 billion in TARP funds, BOA was required to sell the U.S. Treasury $20 billion of preferred stock (thereby materially diluting existing BOA stockholders), which carried an 8% dividend and required BOA to forego all future dividend payments in excess of $.01 per share per quarter for three years without government consent, which further diluted BOA's stockholders and eliminated the value of their shares derived from expected dividends; (vi) in order to close the Merger, BOA was required to obtain a government guarantee on BOA's exposure to *$118 billion* worth of at-risk capital market assets; (vii) in exchange for that government guarantee, BOA was required to issue an additional $4 billion in preferred stock to the U.S. Treasury and forego all future dividend payments in excess of $.01 per share per quarter for three years without government consent, which further diluted BOA's stockholders and eliminated the value of their shares derived from expected dividends; (viii) the sale of the $20 billion in preferred stock would have an immediate dilutive effect on BOA's common stockholders for a period of two to three years; and (ix) the Merger Agreement *expressly provided for Merrill to pay its employees 2008 bonuses in the staggering amount of $5.8 billion* despite the fact that these same masters of the universe had driven Merrill to the brink of bankruptcy.

29. None of these highly-material facts were disclosed to BOA stockholders until January 16, 2009 -- two weeks after the Merger closed. When later asked why the Board did not seek to re-price the Merger or delay the vote, defendant Lewis responded that to do so would have delayed the Merger "at least a couple of months." Of course, there were no other buyers for Merrill and by waiting "a couple of months," Lewis could have saved BOA (and its stockholders) billions of dollars in damages.

30. By Sunday, December 14, 2008, BOA's Chief Financial Officer ("CFO"),

defendant Joseph L. Price ("Price"), had advised defendant Lewis that Merrill had lost an additional *$3 billion in less than two weeks*. These disturbing developments prompted further deliberations within BOA over whether BOA should invoke the MAC clause in the Merger Agreement, and thereby terminate the Merger. Again, in a truly-shocking breach of their duty of loyalty, defendants did not disclose to BOA stockholders either their deliberations over exercising the MAC clause or Merrill's continuing and mounting financial deterioration.

31. Then, on May 7, 2009, the U.S. Government revealed results of certain "stress tests" of large banks conducted by the Fed. BOA was deemed to need an additional $33.9 billion of Tier 1 common capital – far more than any other of the 19 banks tested.

32. In June and July 2009, the Domestic Policy Subcommittee of the Oversight and Government Reform Committee of the House of Representatives held a series of hearings on the Merger, with a particular focus on defendant Lewis's failure to disclose either Merrill's mounting losses or his arrangement to receive a Government bailout. During defendant Lewis's testimony on June 11, 2009, Representative Dennis Kucinich ("Kucinich") told Lewis that, "Our investigation, Mr. Lewis, also finds that Fed officials believe that you are potentially liable for violating securities laws by withholding material information in your possession from shareholders before the vote to approve the merger with Merrill Lynch on December 5th, 2008." Representatives Peter Welch ("Welch") and Elijah Cummings ("Cummings") both repeatedly pressed Lewis on the lack of disclosure to shareholders. As Representative Welch put it: "Did you tell your shareholders that you had come upon this information, that the deal they voted on is not the deal that was going through, because they had a $12 billion hole that was accelerating?" Accordingly, it was revealed to shareholders in June and July 2009 that at least defendant Lewis may have been liable for violating securities laws in connection with the Merger.

33.     As a result of defendants' actions regarding Merrill, BOA became the subject of multiple securities class actions, which have been consolidated in the U.S. District Court for the Southern District of New York, captioned *In re Bank of America Corp. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation*, Case No. 09-MD-02058 (the "Securities Action").[8] U.S. District Judge P. Kevin Castel ("Judge Castel") held, *inter alia*, that the plaintiffs in the Securities Action sufficiently alleged:

a.      "with particularity that Merrill provided BOA with specific, contemporaneous data about its assets and their value while the transaction was pending;"

b.      "with particularity that BOA received ongoing updates on Merrill's finances and that Price was personally informed of Merrill's losses;"

c.      "recklessness as to Price, and satisfies the scienter requirement;"

d.      that it was plausible to infer that Price "engaged in 'conscious recklessness' amounting to 'an extreme departure from the standards of ordinary care'" concerning the Company's disclosures regarding Merrill; and

e.      "by virtue of his position within BOA and his awareness of Merrill's losses, Lewis's inaction on the disclosure issue raises a strong inference of recklessness."

34.     In other words, Judge Castel determined that the Company, Lewis, and Price may have committed securities fraud.     Additionally, Judge Castel determined that defendants Bramble, Gifford, Lozano, and May may have violated the Securities Act.

---

[8]     While Plaintiff and Plaintiff's counsel have conducted their own independent investigation, this Complaint contains references to certain internal documents concerning the Merrill merger, all of which appear in the operative pleading in the Securities Action.

35.     Most recently, on April 12, 2012, the parties to the Securities Action agreed to settle the shareholder derivative claims contained therein for $20 million. The settlement of these derivative claims was clearly inadequate because, *inter alia*, it has been reported that damages may be in excess of *$5 billion* when taking into account all exposures to the Company as a result of the Merrill acquisition. Further, the $20 million does not even cover the $150 million in fines to settle claims with the SEC related to the Merrill acquisition. Plaintiff anticipates that he will file an objection to the settlement.

36.     There is little doubt that BOA has suffered, and will suffer, material damages in connection with these various exposures. On June 29, 2011, Defendants caused the Company to announce that it has reserved *$20 billion* for these and other crisis-era exposures. This reserve amounts to approximately *a quarter* of the Company's current market capitalization.

**D.     The Litigation Demand, Which Is Refused by the Board**

37.     In light of the foregoing events, on August 4, 2011, Plaintiff issued a demand pursuant to Del. Ct. Ch. R. 23.1 (the "Demand") on the Board to commence an action against certain current and/or former directors and executive officers of the Company. A true and correct copy of the Demand is attached hereto as Exhibit A.

38.     On January 19, 2012, the Board, through the Company's Associate General Counsel and Assistant Corporate Secretary, Jennifer E. Bennett ("Bennett"), sent an approximately one-page letter to Plaintiff's counsel (the "Refusal") indicating that that the Board authorized its Audit Committee (the "Audit Committee") "to consider the Demand, undertake such steps as it determines to be advisable, and make recommendations to the Board with respect to the Demand." A true and correct copy of the Refusal is attached hereto as Exhibit B.

39.     The Refusal likewise states that "[t]he Board considered the Demand at its

January 11, 2012 meeting and determined, based on the recommendation of the Audit Committee of the Board, that it is not in the best interests of the Corporation to take this action or pursue the claims that [the Demand] appears to propose."

40.     The Refusal specifically states that "[b]ased on the recommendation of the Audit Committee, and in light of, among other things, the potential adverse effects and the legal and practical barriers to recovery, the Board has determined that the possibility of recovery by pursuing the claims outlined in [the Demand] is outweighed by the risk of weakening the Corporation's defenses in various pending proceedings and, accordingly, that it is not in the Corporation's interest to pursue such claims at this time."

41.     The Refusal contains *no information* whatsoever concerning what kind of investigation the Audit Committee engaged in, or what its substantive findings were regarding the merits of any of Plaintiff's claims as set forth in the Demand, despite the blanket statement that there are "legal and practical barriers to recovery."

42.     Clearly, the Board's complete disregard of the actual merits of the claims set forth in the Demand is improper and demonstrates the Board's lack of diligence and good faith.

43.     Thus, this shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

44.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

45.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the transactions and wrongs complained of herein, including defendants'

participation in the wrongful acts detailed herein, occurred in this District.  Further, defendants regularly conduct business in this District and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

46.     Plaintiff is a current shareholder of BOA and has continuously held BOA stock since at least 2005.  Plaintiff is a citizen of Florida.

47.     Nominal defendant BOA is a Delaware corporation headquartered in Charlotte, North Carolina.  According to its public filings, BOA, through its subsidiaries, provides banking and financial services to individuals, small- and middle-market businesses, corporations, and governments primarily in the United States and internationally.

48.     Defendant Frank P. Bramble, Sr. ("Bramble") has served as a director of the Company since January 2006.  Upon information and belief, defendant Bramble is a citizen of Maryland.

49.     Defendant Charles K. Gifford ("Gifford") has served as a director of the Company since April 2004.  Upon information and belief, defendant Gifford is a citizen of New York.

50.     Defendant Monica C. Lozano ("Lozano") has served as a director of the Company since 2005.  Upon information and belief, defendant Lozano is a citizen of New York.

51.     Defendant Thomas J. May ("May") has served as a director of the Company since April 2004.  Upon information and belief, defendant May is a citizen of Massachusetts

52.     Defendant Price has served as the President of Consumer and Small Business Banking of the Company from February 2010 until September 2011.  In addition, defendant

17

Price served as the CFO of the Company from January 2007 to January 2010 and as the Global Corporate and Investment Banking Risk Management Executive from June 2003 to December 2006. Upon information and belief, defendant Price is a citizen of North Carolina.

53.    Defendant Amy Woods Brinkley ("Brinkley") served as the Company's Global Risk Executive from 2001 to 2009. Upon information and belief, defendant Brinkley is a citizen of North Carolina.

54.    Defendant Lewis served as the CEO of the Company from 2001 to 2009. Upon information and belief, defendant Lewis is a citizen of North Carolina.

55.    Defendant Charles O. Holliday, Jr. ("Holliday") has served as a director of the Company since 2009 and currently serves as its Chairman of the Board. Upon information and belief, defendant Holliday is a citizen of Tennessee.

56.    Defendant Mukesh D. Ambani ("Ambani") has served as a director of the Company since 2011. Upon information and belief, defendant Ambani is a citizen of the Republic of India.

57.    Defendant Susan S. Bies ("Bies") has served as a director of the Company since 2009. In addition, defendant Bies served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Bies is a citizen of South Carolina.

58.    Defendant Virgis W. Colbert ("Colbert") has served as a director of the Company since 2009. Upon information and belief, defendant Colbert is a citizen of Wisconsin.

59.    Defendant D. Paul Jones, Jr. ("Jones") has served as a director of the Company since 2009. In addition, defendant Jones served as a member of the Audit Committee during the Relevant Period. Upon information and belief, defendant Jones is a citizen of Alabama.

60.    Defendant Brian T. Moynihan ("Moynihan") has served as the Company's

President and CEO since 2009.  Upon information and belief, defendant Moynihan is a citizen of North Carolina.

61.     Defendant Donald E. Powell ("Powell") has served as a director of the Company since 2009.  In addition, defendant Powell served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Powell is a citizen of Texas.

62.     Defendant Charles O. Rossotti ("Rossotti") has served as a director of the Company since 2009.   In addition, defendant Rossotti served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Rossotti is a citizen of the District of Columbia.

63.     Defendant Robert W. Scully ("Scully") has served as a director of the Company since 2009.  In addition, defendant Scully served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Scully is a citizen of New York.

64.     Defendant Alvaro G. de Molina ("de Molina") served as the Company's CFO from 2005 until 2006.   Upon information and belief, defendant de Molina is a citizen of North Carolina.

65.     Defendant Barbara J. Desoer ("Desoer") served as President of Bank of America Home Loans from 2008 until February 2012.  Upon information and belief, defendant Desoer is a citizen of California.

66.     Collectively, defendants Holliday, Ambani, Bies, Bramble, Colbert, Gifford, Jones, Lozano, May, Moynihan, Powell, Rossotti, Scully, Price, de Molina, Brinkley, Desoer, and Lewis shall be referred to herein as the "Defendants."

67.     Collectively, defendants Bies, Jones, Powell, Rossotti, and Scully shall be referred to herein as the "Audit Committee Defendants."

## DEFENDANTS' DUTIES

68.     By reason of their positions as officers, directors, and/or fiduciaries of BOA and because of their ability to control the business and corporate affairs of BOA, Defendants owed BOA and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage BOA in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of BOA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to BOA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

69.     Defendants, because of their positions of control and authority as directors and/or officers of BOA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with BOA, each of the Defendants had knowledge of material non-public information regarding the Company.

70.     To discharge their duties, the officers and directors of BOA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of BOA were required to, among other things:

> a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state

laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

71.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

a.  Review and discuss with management the consolidated audited financial statements;

b.  Based upon review and discussion with management, recommend to the Board that the audited consolidated financial statements be included in the Company's annual Form 10-K;

c.  Review and discuss with management quarterly consolidated financial results and primary components of the press release prior to the public announcement of such results;

d.  Review with management the Company's program for compliance with laws and regulations and review the records of such compliance; and

e.  Oversee and assess the Company's policies and procedures for managing and evaluating risk.

## SUBSTANTIVE ALLEGATIONS

**A.     Background of the Company**

72.     BOA is a Delaware corporation headquartered in Charlotte, North Carolina. According to its public filings, BOA is one of the world's leading financial firms and largest banks in the U.S. by assets.  The Company provides a range of banking and nonbanking financial services and products in the U.S. and internationally.

73.     Additionally, BOA is the second-largest bank holding company in the United States by assets, and the fourth-largest bank in the U.S. by market capitalization.  Further, according to public filings, Bank of America serves clients in more than 150 countries and has a

relationship with 99% of the U.S. *Fortune 500* companies and 83% of the *Fortune Global 500*. Notwithstanding the size and scope of the Company's business, its market capitalization has declined 60% (or, over $100 billion) since 2006, and BOA would have failed but for the unprecedented TARP bailout where it received *$45 billion* from federal taxpayers.

74.     Ironically, from 2000 until 2007 (*i.e.,* the majority of the time that Defendants' claimed to not be a part of the subprime business), BOA experienced tremendous growth.  For instance, towards the end of 2000, the Company's stock was trading for around $20 per share. By the end of 2006, Defendants reported "record" earnings of $21.13 billion and BOA stock was trading for around $54 per share with an approximately $220 billion market capitalization.  As discussed herein, when the Company's subprime exposures (and myriad of other problems) were disclosed, the price of the Company's stock fell to a paltry $5 per share, or an over $100 billion market capitalization loss.  Further, it is now evident that the tremendous "growth" experienced by the Company from 2000-2006 was based on false financial results, fueled by the Company's undisclosed (and, in fact, denounced) subprime exposures.

**B.     The Company's Massive, Undisclosed Subprime Exposure**

75.     BOA is subject to the supervision of, and regular inspection by, the Board of Governors of the Federal Reserve System (the "Federal Reserve Board"), and its banking subsidiaries are subject to regulation, supervision and examination by the Office of the Comptroller of the Currency (the "OCC"), the Federal Deposit Insurance Corporation (the "FDIC"), the Federal Reserve Board, and other federal and state regulatory agencies.  The Federal Reserve Board, the OCC and the FDIC have issued substantially similar risk-based and leveraged capital guidelines applicable to BOA's operations.  These guidelines define a multi-tiered capital framework and are used by regulators and investors to evaluate capital adequacy

based primarily on the perceived credit risk associated with balance sheet assets, as well as certain off-balance sheet exposures such as unfunded loan commitments, letters of credit, derivatives, and foreign exchange contracts, if they are known. The guidelines are supplemented by a leverage ratio requirement, calculated by dividing the bank's Tier 1 risk-based capital (the numerator of the ratio) by its average total consolidated assets (the denominator of the ratio).

76.     Effective January 1, 2007, the FDIC adopted, by rule, a rating system employing four capital categories for insured depository institutions (*i.e.,* "well capitalized," "adequately capitalized," "undercapitalized," and "significantly undercapitalized"), and implemented a new two-step categorization process based primarily on a bank's tiered capital and leverage ratios. *See, e.g.*, 12 C.F.R. § 327.9. Under this rating system, to earn the designation of "well capitalized," a bank's total risk-based capital ratio must be equal to or greater than 10%, its Tier 1 risk-based capital ratio must be equal to or greater than 6%, and its Tier 1 leverage capital ratio must be equal to or greater than 5%. *Id.*

77.     Historically, Defendants held out BOA as "visionary" with respect to the underlying toxic capacity of subprime real estate loans. More specifically, on August 15, 2001, Defendants publicly denounced the risks inherent in subprime exposure by announcing that BOA was exiting its subprime real estate lending businesses because they did "not fit the company's strategic and profitability objectives." According to BOA's then-Chairman and CEO defendant Lewis, "[w]e have said for some time that if a business cannot be configured to drive what we believe are consistent, attractive results, we would exit it. *[This] business[] ha[s] very volatile earnings streams, ha[s] become unattractive from a risk reward standpoint and ha[s] not produced required rates of return*." The Company's August 15, 2001 press release further stated:

*The profitability of the subprime real estate lending business is not commensurate with the associated risk.* The company took actions to improve the profitability of this business; however, these improvements have not eliminated concerns about earnings volatility, future credit risk and higher operating costs. New [subprime loan] originations will cease immediately. The company intends to liquidate its $26.3 billion subprime portfolio over the next seven to nine months…

78.   Although BOA purportedly "exited" the subprime mortgage loan origination business during the third quarter of 2001, Defendants nonetheless continued to periodically cause BOA to purchase subprime mortgages from third party loan originators for the purpose of pooling them with Alt-A loans, mid and prime residential mortgages, and other loan products (including HEL), which were then securitized (principally through its limited purpose affiliate, Asset Backed Funding Corp.) as CDOs for sale to investors.

79.   While Defendants caused BOA to only conduct (on average) three such CDO offerings per year between 2002 and 2004, beginning in 2005, Defendants, clearly feeling that they were missing out on the subprime gold rush, caused the Company to substantially increase its CDO underwriting production to 9 offerings, followed by 10 new CDO offerings in 2006.

80.   Even though under Defendants' direction, the Company re-entered the highly risky subprime market, Defendants admitted in the Company's Annual Report filed on March 16, 2006 (*i.e.*, immediately after re-entering the subprime market) that they did not implement any enhanced internal controls over financial reporting regarding the Company's new subprime exposures.   In other words, Defendants caused the Company to be subjected to more risky investments, yet failed modify the Company's internal controls accordingly.

81.   For each of the 2005 and 2006 CDO offerings, BOA retained "super senior" interests in both "mezzanine" and "high grade" portions of these CDOs.   A mezzanine CDO is created by pooling together junior tranches (such as BBB and sub-BBB rated) of subprime RMBS and other loan-based assets.   This asset concentration means that a relatively small rise in

underlying pool losses will simultaneously destroy most of the value of the mezzanine CDOs and negatively impact the super senior tranches.  Further, the value of BOA's subprime/Alt-A/HEL derived CDOs directly correlated to the strength (or weakness) of the U.S. housing market.

82.     In fact, by year-end 2007, under Defendants' direction, BOA increased its net exposure from various subprime exposures to approximately *$11.63 billion*, and these were, of course, the very same volatile subprime mortgage instruments that Defendants previously denounced and which they were supposedly eradicating in mid-2001 "because they do not fit the company's strategic and profitability objectives."  These and other highly risky investments were material to BOA's financial condition and concomitantly impacted the Company's Tier 1 capital and leverage ratios.

83.     On November 9, 2007, Defendants caused BOA to file its Form 10-Q report for the third quarter ended September 30, 2007 with the SEC.  This Form 10-Q reported, in pertinent part:

*Performance Overview*

Net income totaled $3.7 billion, or $0.82 per diluted common share, for the three months ended September 30, 2007, decreases of 32 percent and 31 percent from $5.4 billion, or $1.18 per diluted common share, for the three months ended September 30, 2006. Net income totaled $14.7 billion, $3.25 per diluted common share, for the nine months ended September 30, 2007, decreases of seven percent and six percent from $15.9 billion, or $3.44 per diluted common share, for the nine months ended September 30, 2006.

                    *        *        *

*Global Corporate and Investment Banking*

Net income decreased $1.3 billion, or 93 percent, to $100 million for the same three months ended September 30, 2007, compared to the same period in 2006 as extreme market disruptions adversely impacted total revenue. Total revenue decreased $2.3 billion, or 44 percent, to $2.9 billion driven by a decrease in non-interest income of $2.6 billion. Decreases in trading account profits (losses) of $2.2 billion and investment banking income of $118 million contributed to the reduction in non-interest income. These decreases were partially offset by an increase in net interest income, primarily market-based, of $338 million and a decrease in performance-based incentive compensation. Additionally, the

provision for credit losses increased $192 million reflecting the impact of the weak housing market, particularly on the homebuilder sector.

Net income decreased $1.3 billion, or 29 percent, to $3.3 billion for the nine months ended September 30, 2007, compared to the same period in 2006. Total revenue decreased $1.8 billion, or 11 percent, and provision for credit losses increased $302 million, contributing to the decrease in net income. These period-over-period changes, with the exception of investment banking income, were driven by the same factors as described in the three-month discussion above. The increase in investment banking income of $240 million was due to strength in debt underwriting and growth in advisory fees when compared to the same period in the prior year. In the nine-month comparison, provision for credit losses was also impacted by the absence of 2006 releases of reserves related to favorable commercial credit market conditions, higher net charge-offs in the retail automotive loan portfolio due to growth and seasoning, and a lower level of commercial recoveries.[]

*Provision for Credit Losses*

The provision for credit losses increased $865 million to $2.0 billion and $1.6 billion to $5.1 billion for the three and nine months ended September 30, 2007, compared to the same periods in 2006. Reserve increases for higher losses inherent in our small business and home equity portfolios, reflective of growth in these businesses, drove the majority of the increase in provision for credit losses. The impact of the weak housing market on the homebuilder sector if our commercial portfolio and on our home equity portfolio was also a contributor.

Higher net charge-offs of $296 million and $1.4 billion for the three and nine months ended September 30, 2007, were predominantly driven by portfolio seasoning reflective of growth in the businesses and increases from the unusually low charge-off levels experienced in 2006 post bankruptcy reform.

84.    With regard to the BOA's "recent events" relating to its CDO portfolio and its

impact on results of the Company's operations, the Form 10-Q set forth:

During the third quarter, extreme dislocations emerged in the financial markets, including leveraged finance, subprime mortgage, and the commercial paper markets, and these dislocations were further compounded by the decoupling of typical correlations in the various markets in which we participate. These conditions created less liquidity, a flight to quality, greater volatility, widening of credit spreads and a lack of price transparency. The Corporation's *Capital Markets and Advisory Services* business within the *GCIB* segment operates in these markets, either directly or indirectly, through exposures in securities, loans, derivatives and other commitments and has been and will continue to be adversely impacted by this market disruption. We believe it may take more time for the markets to return to a more normal environment with tighter credit spreads and greater liquidity. For further discussion on how these events affected our businesses and results of operations for the three and nine months ended September 30, 2007, refer to the *GCIB* discussion beginning on page 73.

Subsequent to September 30, 2007 the credit ratings of certain structured securities (i.e., CDOs) were downgraded which among other things triggered

further widening of credit spreads for this type of security. We have been an active participant in the CDO market and maintain ongoing exposure to these securities (see pages 78 and 90 for a further discussion of our CDO exposure). We expect these significant dislocations in the CDO market to continue, and it is unclear what impacts these dislocations will have on other markets in which we operate or maintain positions. Previous dislocations experienced in the credit markets were largely confined to the *Capital Markets and Advisory Services* business. The current dislocations in the markets will continue to affect our *Capital Markets and Advisory Services* business and may have broader impacts on the Corporation, including certain businesses within *GWIM* (see page 92 for a further discussion of support of cash funds in *GWIM*) . We anticipate that these developments will adversely impact our results during the fourth quarter.

85.    With respect to results of operations, the Form 10-Q also set forth:

*Collateralized Debt Obligations Exposures at September 30, 2007*

As previously mentioned in Recent Events on page 48, subsequent to September 30, 2007, credit spreads on CDOs have been widening. The following is a summary of our CDO exposure. At September 30, 2007, we provided $15.5 billion, or $12.8 billion net of amounts hedged (principally with financial guarantees from insurers), in liquidity support for commercial paper issued by CDOs. The commercial paper is the most senior class of securities issued and benefits from the subordination of all other securities, including AAA-rated securities. The net amount that is principally backed by subprime residential mortgage exposure totaled $9.8 billion. This amount included approximately $9.4 billion of high grade asset-backed securities, net of hedges, of which $3.2 billion was consolidated, and $400 million of mezzanine asset-backed securities. The $9.4 billion of high grade asset-backed securities includes $5.5 billion of CDOs collateralized by other CDOs. For more information on the liquidity support refer to Collateralized Debt Obligations beginning on page 90.

We also have exposure to CDOs through our structuring, warehousing and trading activities. At September 30, 2007, we had $2.4 billion in super senior securities exposure retained as part of our CDO structuring business, net of $2.8 billion that is hedged (principally with financial guarantees from insurers). The super senior tranche is the most senior class of securities issued by the CDOs and benefits from the subordination of all other securities issued by the CDO, including AAA-rated securities. The portion that is backed principally by subprime residential mortgage exposure was $1.9 billion, net of $2.1 billion of hedges. The net portion backed principally by subprime residential mortgage-backed exposure included approximately $400 million, net of hedges, of high grade asset-backed securities CDOs and $1.5 billion of mezzanine asset-backed securities CDOs.

We also had CDO exposure of approximately $1.0 billion in CDO warehouses. The portion backed principally by subprime residential mortgage exposure was approximately $400 million. We had other subprime exposure related to loans pending securitization of approximately $1.8 billion and outstandings under financing transactions of approximately $1.0 billion.

In addition to the CDO-related exposures discussed above, we continue to actively manage various exposures as part of our normal sales and trading activities.

86.    Defendants additionally provided the following information concerning the Company's HEL products in the Form 10-Q:

*Home Equity*

At September 30, 2007, approximately 73 percent of the managed home equity portfolio was included in GCSBB, while the remainder of the portfolio was mostly in GWIM This portfolio consists of both revolving and non-revolving first and second lien residential mortgage loans and lines of credit. On a held basis, outstanding home equity loans increased $13.2 billion, or 15 percent, at September 30, 2007 compared to December 31, 2006, as organic home equity production remained strong. Nonperforming home equity loans increased $473 million compared to December 31, 2006 and net charge-offs increased $39 million and $63 million for the three and nine months ended September 30, 2007 compared to the same periods in 2006. These increases were primarily driven by seasoning of the portfolio, reflective of growth in the business and the impact of the weak housing market, including the impact of declines in home prices in certain geographic areas on net charge-off levels.

*        *        *

*Provision for Credit Losses*

The provision for credit losses was $2.0 billion for the three months ended September 30, 2007, a 74 percent increase compared to the same period in 2006. For the nine months ended September 30, 2007, the provision for credit losses was $5.1 billion, a 48 percent increase compared to the same period in 2006.

The consumer portion of the provision for credit losses increased $350 million to $1.4 billion, and $607 million to $3.8 billion for the three and nine months ended September 30, 2007 compared to the same periods a year ago. Higher net charge-offs from portfolio seasoning, reflective of growth in the businesses and increases from the unusually low charge-off levels experienced in 2006 post bankruptcy reform drove a portion of the increase. Additionally, reserve increases related to higher losses inherent in our home equity portfolio reflecting growth in the business and the impact of the weak housing market in certain geographic areas as well as seasoning of the Card Services consumer portfolios contributed to the increased provision expense. The nine-month increase was partially offset by reserve reductions from the addition of legacy Bank of America accounts which have a higher loss profile to the domestic consumer credit card securitization master trust and from improved performance of the remaining portfolios from consumer finance businesses that we have exited.

*        *        *

*Allowance for Loan and Lease Losses*

The allowance for loan and lease losses is allocated based on two components. We evaluate the adequacy of the allowance for loan and lease losses based on the combined total of these two components. The allowance for loan and lease losses excludes loans measured at fair value in accordance with SFAS 159 as mark-to-

market adjustments related to loans measured at fair value include a credit risk component.

*     *     *

The second component of the allowance for loan and lease losses covers performing commercial loans and leases measured at historical cost and consumer loans. The allowance for commercial loan and lease losses is established by product type after analyzing historical loss experience by internal risk rating, current economic conditions, industry performance trends, geographic or obligor concentrations within each portfolio segment, and any other pertinent information. The commercial historical loss experience is updated quarterly to incorporate the most recent data reflective of the current economic environment. As of September 30, 2007, quarterly updating of historical loss experience did not have a material impact on the allowance for loan and lease losses. The allowance for consumer and certain homogeneous commercial loan and lease products is based on aggregated portfolio segment evaluations, generally by product type. Loss forecast models are utilized that consider a variety of factors including, but not limited to, historical loss experience, estimated defaults or foreclosures based on portfolio trends, delinquencies, economic trends and credit scores. These loss forecast models are updated on a quarterly basis in order to incorporate information reflective of the current economic environment. As of September 30, 2007, quarterly updating of the loss forecast models resulted in increases in the allowance for loan and lease losses primarily due to higher losses inherent in the small business card and home equity portfolios and seasoning of the Card Services unsecured lending portfolio. Included within this second component of the allowance for loan and lease losses and determined separately from the procedures outlined above are reserves which are maintained to cover uncertainties that affect our estimate of probable losses including the imprecision inherent in the forecasting methodologies, as well as domestic and global economic uncertainty, large single name defaults and event risk.

We monitor differences between estimated and actual incurred loan and lease losses. This monitoring process includes periodic assessments by senior management of loan and lease portfolios and the models used to estimate incurred losses in those portfolios.

Additions to the allowance for loan and lease losses are made by charges to the provision for credit losses. Credit exposures deemed to be uncollectible are charged against the allowance for loan and lease losses. Recoveries of previously charged off amounts are credited to the allowance for loan and lease losses.

The allowance for loan and lease losses for the consumer portfolio ... was $5.6 billion at September 30, 2007, an increase of $39 million from December 31, 2006. This increase was attributable to increases in reserves in the Card Services unsecured lending and home equity portfolios reflective of growth and seasoning. The increase in the home equity reserves is also due to higher losses inherent in the portfolio reflecting the impact of the weak housing market in certain geographic areas. These increases were mostly offset by reserve reductions from the addition of legacy Bank of America accounts which have a higher loss profile to the domestic consumer credit card master trust, net new issuances of securitizations from the trust, and improved performance of the remaining portfolios from consumer finance businesses that we have exited.

87.    On October 1, 2007, Defendants caused BOA to acquire all of the outstanding shares of ABN AMRO North America Holding Company, the parent of LaSalle Bank Corporation ("LaSalle"), for $21.0 billion in cash.  Defendants caused the Company to publicly report this event in a Form 8-K filing with the SEC that same day.  However, as a result of this acquisition, Defendants caused the Company to significantly deplete its reportable Tier 1 capital which, in turn, reduced BOA's Tier 1 leverage ratio to, purportedly, just slightly above the 5% threshold necessary to maintain a "well capitalized" designation.

88.    On January 22, 2008, Defendants caused BOA to file a Form 8-K with the SEC in connection with its release of the Company's results of operations for the fourth quarter 2007.  Expressly incorporated by reference in the Form 8-K was Exhibit 99.3 appended to the filing, entitled "Supplemental Information — Fourth Quarter 2007."  This document contained BOA's financial results for the fourth quarter and year ended 2007.  Defendants caused BOA to disclose fourth quarter mark-to-market write downs on its high grade, mezzanine and CDO squared tranches in the Company's "Super Senior" CDOs of $873 million, $757 million and $2.329 billion, respectively.  The Form 8-K also revealed that at year end 2007, BOA's HEL portfolio (held) was $144.8 billion and nonperforming HELs were $1.3 billion, respectively.  In addition, Defendants caused the Company to report year end 2007 Tier 1 capital and leverage ratios of 6.87% and 5.04%, respectively.

89.    On February 28, 2008, Defendants caused BOA to file its Form 10-K annual report for 2007 with the SEC (the "2007 Form 10-K").  The 2007 Form 10-K stated, in pertinent part:

*Performance Overview*

Net income was $15.0 billion, or $3.30 per diluted common share in 2007, decreases of 29 percent and 28 percent from $21.1 billion, or $4.59 per diluted common share in 2006.

*Global Consumer and Small Business Banking*

Net income decreased $1.9 billion, or 17 percent, to $9.4 billion in 2007compared to 2006. Managed net revenue rose $2.8 billion, or six percent, to $47.7 billion driven by increases in both non-interest and net interest income. Non-interest income increased $21.1 billion, or 13 percent, to $18.9 billion driven by higher card, services charge and mortgage banking income. Net interest income increased $612 million, or two percent, to $18.8 billion due to the impacts of organic growth and the LaSalle acquisition on average loans and leases, and deposits. These increases in revenues were more than offset by the increase in provision for credit losses of $4.4 billion, or 51 percent, to $12.9 billion. This increase reflects portfolio growth and seasoning, increases from the unusually low loss levels experienced in 2006 post bankruptcy reform, the impact of the housing market weakness on the home equity portfolio, and growth and deterioration in the small business portfolio. Non-interest expense increased $1.7 billion, on none percent, mainly due to increases in personnel and technology-related costs.

*Global Corporate and Investment Banking*

Net income decreased $5.5 billion, or 91 percent, to $538 million, and total revenue decreased $7.7 billion, or 37 percent, to $13.4 billion in 2007 compared to 2006. These decreases were driven by $5.6 billion in losses resulting from our CDO exposure and other trading losses. These decreases were partially offset by an increase in net interest income, primarily market-based, of $1.3 billion, or 14 percent. The provision for credit losses increased $643 million driven by the absence of 2006 releases or reserves, higher net charge-offs and an increase in reserves during 2007 reflecting the impact of the weak housing market particularly on the homebuilders loan portfolio. Non-interest expense increased $347 million, or three percent, mainly due to an increase in expenses related to the addition of LaSalle partially offset by a reduction in CMAS performance-based incentive compensation.

90.     The 2007 Form 10-K that the Company had year-end risk-based capital ratios of:

Tier 1 - 6.87%; Total - 11.02%; and Tier 1 Leverage - 5.04%.

91.     Then, on May 8, 2008, Defendants caused BOA to file its Form 10-Q report for

the quarter ended March 31, 2008 with the SEC.  That Form 10-Q stated, in pertinent part:

*Performance Overview*

Net income was $1.2 billion, or $0.23 per diluted common share for the three months ended March 31, 2008, decreases of 77 percent and 80 percent from $5.3 billion, or $1.16 per diluted common share for the same period in 2007.

*        *        *

*Assets*

At March 31, 2008, total assets were $1.7 trillion, an increase of $20.8 billion, or one percent, from December 31, 2007. Growth in period end total assets was mostly due to increases in derivative assets, debt securities and other assets. These increases were partially offset by a decrease in federal funds sold and securities purchased under resale agreements. The increase in derivative assets were primarily due to the weakening U.S. dollar which drove higher replacement costs for outstanding foreign currency contracts and an increase in the value of our credit derivatives due to widening credit spread on purchase credit protection. Debt securities increased due in part to the securitization of residential mortgage loans into mortgage -backed securities that were retained by us. The increase in other assets was primarily due to higher levels of unsettled trades relating to our capital markets activities which have cleared since quarter ended.

*        *        *

*Provision for Credit Losses*

The Provision for credit losses increased $4.8 billion to $6.0 billion for the three months ended March 31, 2008, compared to the same period in 2007.

The Consumer portion of the provision for credit losses increased $3.6 billion to $4.6 billion for the three months ended March 31, 2008, compared to the same period in 2007. This increase was primarily driven by reserve increases and higher net charge-offs in our home equity and residential mortgage portfolios, reflective of deterioration in the housing markets particularly in geographic areas that have experienced the most significant declines in home prices. Portfolio seasoning and to a lesser extent the slowing economy resulted in reserve increases in the unsecured lending and domestic credit card portfolios. The absence of prior year reserve reductions that resulted from additions of higher loss profile accounts to the domestic credit card securitization trust also contributed to the increase in provision. Additionally, net charge-offs increased in other domestic consumer portfolios reflecting portfolio seasoning, the impacts of a slowing economy, particularly in geographic areas with the weakest housing markets, and higher bankruptcies.

The commercial portion of the provision for credit losses increased $1.2 billion to $1.4 billion for the three months ended March 31, 2008, compared to the same period in 2007. Reserves were increased for higher losses in the small business portfolio within GCSBB reflecting the impacts of a slowing economy, particularly in geographic areas that have experienced the most significant home price declines as well as seasoning of portions of the portfolio originated in periods of higher growth. The housing market slowdown also drove increases in the reserves on the homebuilder loan portfolio within GCIB. The First quarter of 2007 also included a reduction of reserves in All Other reflecting the sale of our Argentina portfolio. Additionally, net charge-offs were higher in the small business portfolios with GCSBB and the homebuilder loan portfolios in GCIB.

32

The provision for credit losses related to unfunded lending commitments was negative $11 million for the three months ended March 31, 2008, compared to $7 million for the three months ended March 31, 2007.

92.     In addition, the Form 10-Q contained virtually the same language in the section entitled, *"Allowance for Loan and Leases Options,"* as that contained in the Company's third quarter 2007 Form 10-Q, but concluding with:

> The allowance for loan and lease losses for the consumer portfolio ... was $9.2 billion at March 31, 2008, an increase of $2.5 billion from December 31, 2007. This increase was primarily driven by reserve increases related to higher losses in our home equity and residential mortgage portfolios. Portfolio seasoning and to a lesser extent the slowing economy resulted in reserve increases in the unsecured lending and domestic consumer credit card portfolios.

> The allowances for commercial loan and lease losses was $5.6 billion at March 31, 2008, an $817 million increase from December 31, 2007. The increase in allowance levels was driven by higher losses in the small business portfolio within *GCSBB* and reserve increases on the homebuilder loan portfolio within *GCIB*.

> The allowance for loan and lease losses as a percentage of total loans and leases outstanding was 1.71 percent at March 31, 2008, compared to 1.33 percent at December 31, 2007. The increase in the ratio was primarily driven by reserve increases for higher losses in home equity, residential mortgage and commercial homebuilder loan portfolios, reflective of deterioration in the housing markets particularly in geographic areas that have experienced the most significant home price declines. Reserve increases for portfolio seasoning and the impacts of a slowing economy on the *Card Services'* small business, unsecured lending and domestic credit card portfolios also contributed to the higher ratio.

93.     Critically, even though they did not create enhanced internal controls, Defendants cannot credibly claim that they were unaware of the risks the subprime market posed to the Company during this timeframe.  For instance, in the Company's Annual Report filed with the SEC on February 28, 2008, Defendants stated "[a] sharp rise in defaults on subprime mortgages and worries about the potential fallout from the faltering housing and subprime mortgage markets triggered financial market turbulence beginning in the summer."  Thus, Defendants were keenly aware of the destructive effects of the subprime market.

## C.     Defendants' Failure to Disclose Accurate Results of Operations and Capital Base

94.     In early 2007, Defendants recognized that a significant concentration of credit risk

imbedded in BOA-originated real estate loans existed (*i.e.*, residential mortgages, commercial real estate loans, and HELs). Defendants also knew (or should have known) through the Company's internal reporting procedures and controls that the amount of nonperforming real estate loans had been steadily increasing quarter since late-2006.

95.   For example, even when factoring in the credit risk mitigation employed by BOA, the quantum of BOA's actual quarterly nonperforming residential and commercial real estate loans (*i.e.*, loans 90 days in default) and loan charge offs in comparison to the quarterly reserves Defendants caused to be set aside for these assets (as reported in its SEC filings), reveals a substantial short fall for the second ($181 million), third ($148 million) and fourth quarters ($611 million) for 2007 that is indicative of Defendants' failure to accurately report BOA's actual results of operations in 2006.

96.   A more troublesome qualitative issue existed, however, with respect to the rising number of BOA-originated residential loan defaults and charge-offs during 2007 because of the purported underlying quality of the borrower and loan underwriting attributable to BOA. Specifically, since the decision to exit the subprime loan origination market in August 2001, the Company's residential loan portfolio was purportedly heavily weighted with prime loans and a less number of Alt-A loans. The fact that these high quality loans were now beginning to default in material numbers in the tightening credit and liquidity markets portended poorly for the fate of the subprime loans that BOA had obtained from Countrywide and other originators that the Company pooled, securitized and placed tranches thereof into BOA-originated CDOs — portions of which BOA had retained for its own investment.

97.   Additionally, by June 30, 2007, BOA held approximately $96.5 billion in HELs, representing approximately 18.9% of the Company's total amount of held consumer loans and

leases while the percentage of nonperforming HELs had grown 70% over the first six months of 2007 (from $291 million at year end 2006 to $496 million at June 30, 2007). By September 30, 2007, the amount of BOA originated HELs that the bank held on its books had grown to over $101 billion, the amount of nonperforming HELs mushrooming to $764 million (an increase of over 160% since the end of 2006). Similarly, fourth quarter 2007 results of operations associated with BOA's HEL portfolio show increasing HEL defaults (total HELs held $114.8 billion; nonperforming HELs $1.3 billion).

98.     Inexplicably, BOA's HEL write-offs during 2007 remained a small fraction of the Company's actual credit loss exposure, and was significantly less than banking industry peers Citibank and J.P. Morgan. For example, BOA's net charge offs for HELs during the first, second, third and fourth quarter 2007 (expressed as a percentage of its average HEL loan balances, on an annualized basis) was .08%, .12%, .20% and .63%, respectively. By comparison, for this same period Citibank's HEL net charge offs were .47%, .61%, .94% and 1.67%, respectively, and J.P Morgan's were .32%, .44%, .65% and 1.05%, respectively.

99.     Thus, as a result of the lax internal controls and procedures that Defendants implemented, Defendants failed to charge off (cumulatively) a total of approximately $209 million, $262 million and $626 million for impaired residential mortgages, commercial real estate loans and HELs for the second, third, and fourth quarter 2007, respectively.

100.    In addition, according to the Company's Form 8-K filed on January 22, 2008, fourth quarter mark-to-market write downs on its high grade, mezzanine and CDO squared tranches in the Company's "Super Senior" CDOs were $873 million, $757 million and $2.329 billion, respectively. However, a comparison of BOA's fourth quarter 2007 CDO write downs with those publicly filed by two industry peers (Citibank and UBS AG) — financial institutions

whose CDO respective portfolios contain substantially the same mix and vintages of underlying securitized assets — reveals that BOA should have written down an additional $2.2 to $3.6 billion on these financial instruments.

101.    Moreover, in an April 14, 2010 SEC filing, Defendants admitted that between March 2007 and March 2009 they repeatedly failed to employ adequate internal controls and procedures to protect against this type of erroneous reporting of RMBS transactions and their impact on the Company's financial results. *Specifically, Defendants admitted in response to an SEC investigation that under their direction, BOA improperly accounted for as much as $28 billion in RMBS asset transactions* (including transactions on March 31, 2007, for $4.5 billion; December 31, 2007, for $2.0 billion, and September 30, 2008, for $10.7 billion) on its balance sheet through repurchasing agreements known as "Dollar Rolls"[9] or "Repo to Maturity" transactions.  According to the filing, Defendants caused BOA to begin utilizing these types of transactions in 2007 to reduce the balance sheet of its Global Corporate & Investment Banking business unit "to meet internal quarter end limits for balance sheet utilization capacity."  The transactions involved an agreement whereby Defendants caused BOA to temporarily move certain RMBS investments off its books to unidentified inter-dealer brokers at the end of a financial quarter, with an agreement in place to repurchase a similar pool of securities in a later reporting period.  In other words, Defendants were manipulating BOA's reported earnings to make it appear that BOA's balance sheet was far-less-risky than it actually was.  The truth, however, was that BOA's balance sheet was not "strong," and that BOA (and its shareholders),

---

[9]    In a typical Dollar Roll, a lender agrees to sell the securitized asset to a buyer in return for cash.  At the termination of the transaction, similar securities are resold at a predetermined price plus an interest payment.  To properly be recorded as a sale, the securitized asset ultimately repurchased cannot be the same or substantially the same as those transferred.

similar to their peers, faced massive, undisclosed exposure.

102.   In the April 14, 2010 filing, Defendants admitted that they caused BOA to incorrectly classify and account for the Dollar Roll transactions as "sales" when they were really a "secured borrowing" because BOA repurchased "substantially the same securities." Defendants have claimed that the failure to correctly account for the transactions as secured borrowings did not stem "from any intentional misstatement" and were not related to "any fraud or deliberate error."   Instead, Defendants claimed that the errors were caused by an internal "control deficiency" in that under Defendants' direction BOA did not review completed Dollar Roll transactions to ensure that repurchased securities were not "substantially the same" as the transferred securities, thus resulting in the unintentional accounting impropriety.   The multiple instances of erroneous accounting of these transactions during the Relevant Period evidences and highlights BOA's admitted lax internal controls and procedures concerning the very same types of investment vehicles at issue in this case.

103.   As a result of the errors committed by Defendants in writing off and/or reserving against bad loans and assets, Defendants caused the Company to misstate its risk-based capital ratios in its fourth quarter and year end results of operations.   Specifically, in a January 22, 2008 Form 8-K, Defendants caused BOA to report the Company's Tier 1 capital and Tier 1 leverage ratios to be 6.87% and 5.04%, respectively.   However, because of Defendants' failure to mark-to-market BOA's CDO portfolio and take appropriate charge offs and reserves on its impaired real estate loans at year end 2007, Defendants caused the Company to artificially inflate the Tier 1 capital and Tier 1 leverage ratios reported in its January 22, 2008 Form 8-K (and subsequently in its 2007 Form 10-K annual report), i.e., the correct figures for these highly material regulatory guidelines of BOA's capital adequacy were approximately 6.63% and 4.85%, respectively.

Importantly, a Tier 1 leverage ratio of only 4.85% would have required that Defendants downgrade BOA's capitalization status from "well capitalized" to an "adequately capitalized."

104.    On January 22, 2008, Defendants caused BOA to file a Form 8-K with the SEC detailing the Company's fourth quarter and year end 2007 financial results. Following the recitation of the highlights of BOA's 2007 the results of operations during a conference call and webcast involving securities analysts, defendants Lewis and Price repeatedly assured analysts of the soundness of the Company's CDO reserves and write-downs:

**Ed Najarian — Merrill Lynch**

And then, sorry to take up too much time here, but just one more. It looks like your subprime CDO write downs are less significant than some of your competitors and you alluded to the fact that I guess most of the driver of your decision process for how much to take in subprime CDO write downs was a mark to model process. It sounds like you are taking a mark to model process and assuming that you will hold those CDO positions through to maturity, is that the correct way to look at the vast majority of that?

**Joe Price**

No it's probably the other way, Ed, we kind of come to the view from a management standpoint that a lot of these structures terminate and therefore we look through to the net asset values of the underlying securities and that would really be, Ed, the ones that we have kind of cash flowed to term in essence we've looked at those and said they're more like an IO so you kind of cash flow to termination and just value that piece and that kind of puts an IO floor on the value of that. But it's probably more of a termination view than a hold to term view that you referenced earlier. I think what you'll find is we've seen a bit of a bigger multi sector player as opposed to straight subprime imbedded in a lot of the structures and that probably tends to be one of the biggest drivers and then obviously the vintage of the underlying portion that is subprime.

**Ken Lewis**

Ed, we have tried, we obviously tried our very best to look at others and see their mark downs and it gets real hard because the paper is just different.

*       *       *

**Ron Mandle — GIC**

Yeah hi thanks, I was going to ask pretty much the same question about CDOs, I guess my only concern is that if I read the table right it's CDO squared so anything you can elaborate on that regarding the underlying attachment points, that type of thing.

**Joe Price**

Ron if you look back in the comments I made earlier, I tried to give you a feel for how much of the underlying collateral was not subprime related and then the vintage that was in it and I think that probably points you to how much of the collateral was not subprime as maybe being the primary driver from that standpoint.

**Ron Mandle — GIC**

Okay and then so would it be safe to assume that the subprime part you've written down very, very heavily and the non-subprime part you've written down lightly? Would that be a way to think about it?

**Joe Price**

It's a way to think about it, it varies by particular structure because in some it may be earlier vintages subprime that would not make that necessarily correct but I think in general that's a fair way for you to be thinking about it.

105.    Accordingly, as a result of Defendants' breaches, the Company became even more exposed to these highly risky investments.  These and other highly risky investments were material to BOA's financial condition and concomitantly impacted the Company's Tier 1 capital and leverage ratios, which, as discussed here, eventually brought the Company to its knees during the worldwide economic meltdown in 2008.

D.    **The Board's Disastrous Countrywide Acquisition**

106.    In addition to the Company's material (and undisclosed) subprime related exposures discussed above, in August 2007, Defendants dramatically increased the Company's subprime exposure when they caused BOA to announce that it had made a $2 billion convertible

39

preferred stock investment in Countrywide, which was then the largest mortgage lender in the U.S. The convertible nature of this securities transaction provided BOA with a 16% beneficial interest in Countrywide. Defendants also subsequently reported the transaction in the Company's Form 10-Q report for the third quarter ended September 30, 2007.

107.   As Defendants should have known, Countrywide's financial health was rapidly deteriorating to the point where it was not an attractive investment. Specifically, Countrywide had suffered a series of severe business disruptions resulting from its improper mortgage origination practices, lax underwriting standards, and toxic debt securitization practices. As a result of these practices, for the fourth quarter of 2007 (*i.e.*, immediately before the CW Acquisition), Countrywide reported a loss of *$422 million*. In total, Countrywide finished 2007 with a loss of $704 million.

108.   On January 11, 2008, purportedly after completing thirty (30) days of "extensive due diligence," occupying over sixty (60) BOA personnel, Defendants caused the Company to announce, pursuant to a Form 8-K filing with the SEC, that a definitive agreement had been reached to commence the CW Acquisition. Countrywide's stock was trading hands for approximately $7 per share on the date of the announcement, which was approximately an 85% decline from its price two years earlier. Defendant Lewis publicly touted the CW Acquisition as a "once in a lifetime opportunity" for BOA to become the number one mortgage originator and servicer in the nation. The CW Acquisition was formally completed on July 1, 2008.

109.   However, Defendants' public representations regarding their extensive due diligence failed to identify severe existing problems, concerning the liabilities attendant to Countrywide's financial condition and its failure to follow proper mortgage lending and underwriting practices from 2005-2007. As BOA spokesman Robert Stickler stated on June 8,

2008 regarding the CW Acquisition, "*We understood that there was a black hole from here to there and that Countrywide was going to go through some financial difficulties. The question was, how big is the hole.*" As detailed below, the extent of the Countrywide hole was not manageable, and should have been detected through Defendants' due diligence investigation.

110.   To the contrary, in a press release filed with the SEC on January 11, 2008, Defendants caused BOA to announce the intended acquisition of Countrywide, stating, *inter alia,* that:

> The purchase will make Bank of America the nation's largest mortgage lender and loan servicer. This is an important advancement in the company's desire to help customers and clients meet all of their financial needs.

> *       *       *

> Bank of America would gain greater scale in originating and servicing mortgages in the U.S. Countrywide half $408 billion in mortgage originations in 2007 and has a servicing portfolio of about $1.5 trillion with 9 million loans.

> "Countrywide presents a rare opportunity for Bank of America to add what we believe is the best domestic mortgage platform at an attractive price and to affirm our position as the nation's premier lender to customers," Bank of America Chairman and Chief Executive Officer Kenneth D. Lewis said. ... "We are aware of the issues within the housing and mortgage industries," Lewis continued. "The transaction reflects those challenges. Mortgages will continue to be an important relationship product, and we now will have an opportunity to better serve our customers to enhance future profitability."

> Bank of America expects $670 million in after-tax savings in the transaction, or 11 percent of the expense base of the two companies' mortgage operations. About one third of those savings would come in 2009, two thirds would be realized in 2010 and savings would be fully realized in 2011.

111.   In coordination with the press release and in preparation for a conference call and webcast with securities analysts, on January 11, 2008, Defendants caused BOA to file a presentation with the SEC under Rule 425, entitled "Bank of America Acquiring Countrywide Financial," stating, *inter alia*, that the proposed transaction provided BOA the "unique

opportunity to gain [a] leading position in consumer real estate" because:

- Bank of America gains immediate scale becoming the largest mortgage originator and servicer

- Currently, Bank of America ranks 5th in the U.S. in mortgage originations and 6th in mortgage servicing

- Affirms our status in the United States as a premier consumer bank with a strong Deposit, Card, and Mortgage product suite

- Broadens mortgage capabilities to new and existing customers further driving future profitability

- Enhances capabilities of a leading mortgage technology platform

- Presents a one-time opportunity to acquire the largest U.S. mortgage platform.

112.   Defendants' presentation further stated that the CW Acquisition would require the issuance of additional capital to maintain BOA's Tier 1 capital and projected an earnings per share impact (excluding restructuring charges) as "neutral" for 2008 and "3% accretive in 2009."

113.   Also on January 11, 2008, defendants Lewis and Price held a conference call with analysts to discuss the CW Acquisition.  During the call, defendant Lewis stated, *inter alia*:

Today's announcement presents a unique opportunity to acquire the mortgage capabilities and scale that are critical to our customer relationships at a time when valuations are in fact very compelling. *Our extensive due diligence supports our overall valuation and pricing the transaction.*

\*       \*       \*

With this transaction, we have affirmed our relationship with consumers as we gain the leadership position in one of the most important products in our relationship.

\*       \*       \*

And while we are regarded as one the most efficient mortgage shops, Countrywide has product expertise and a sales culture that tops our capabilities. By utilizing their skill sets, we can offer more mortgage capabilities to our vast customer base.

\*       \*       \*

*So we view this as a one-time opportunity to acquire the best mortgage platform in the business at a time when the value is very attractive.*

          \*      \*      \*

As you are all aware, this year has been tough for them as their model was severely impacted by market liquidity concerns and the ability to fund asset growth. These problems play into our strengths as we have the funding of our deposit book and access to the markets to continue to grow the business.

          \*      \*      \*

The good news is much of the originations in the current market are of much higher quality and better spreads than the past couple of years. Last, the secondary markets remain fragile and worth keeping an eye but many spreads have been improving.

114.    On the January 11, 2008 analyst teleconference, defendant Price elaborated on the CW Acquisition stating, *inter alia*:

Now, as Ken said the due diligence on this deal was extensive. We had more than 60 people on the ground for the better part of the last 30 days, with more focus picking up through the holidays. The focus of the due diligence, as you would expect, was on the mortgage servicing rights, credit, and legal, as well as accounting and operational areas. The results of our due diligence support our overall valuation and pricing of the transaction.

Let me take you through some of the assumptions we considered as you analyze the transaction.

We used the First Call consensus estimates as a base for modeling. We assumed an early third quarter 2008 close so Countrywide results will be in the numbers for one half of the year 2008. We made adjustments for assumptions of cost savings and some business model adjustments, which leave the transaction neutral to earnings in 2008 but accretive in the following years.

115.    Immediately following the January 11, 2008 presentation, a question and answer session ensued regarding the CW Acquisitions effects on Tier 1 capital ratios and BOA's extensive due diligence investigation of Countrywide:

Mike Mayo – Deutsche Bank

And how much capital do you expect to issue?

Joe L. Price

To stay capital neutral on this transaction, and we'll give you an update on capital of the larger corporation in a week at the earnings call in a little over a week, but

in this transaction if you just look at the purchase price, today's prices it would take you incrementally another couple of billion dollars would be my expectation.

\*          \*          \*

Ron Mandel — GIC

I'm wondering Joe, if you can expand more on purchases accounting. My superficial understanding is that when you buy below book value like this, so you are buying about $9 billion below book value that you could actually mark the assets down by $9 billion without significant changing any of the other financials, so I'm wondering how much you think you'll have to write down assets, build legal services, and basically how you plan on using that $9 billion by which you are paying below tangible book?

Joe L. Price

Ron, you are right on describing purchase accounting being that you fair value the assets and liabilities at the date of the transaction and then, after you do that, you compare that to the purchase price and have to in essence squeeze them to down to fit it or else you create negative good will.

Based on all of our due diligence, we feel that the purchase price allocation encompasses our ability to take any type of fair value adjustments needs but the specifics of that obviously will have to be worked out at the date of the actual merge, so the fair values at those dates. But it would obviously include between all the assets and liabilities, which portion of the loans would be there, as well as any other open liabilities that would be accruable under GAAP.

\*          \*          \*

Ronald Temple - Lazard Capital Markets

And I guess part two of that is how are you thinking about the loss content in the thrift loan portfolio? I'm assuming that's embedded but clearly there's some concerns around that portfolio, so how have you guys looked at that?

Joe L. Price

Ron, we would have done our own, as Ken just alluded to and I described, we did our own due diligence and clearly incorporated that. And what I can tell is when you couple that with all of the other items that we covered in due diligence, got comfortable that the economics that we arrived at in pricing the transaction fully reflected the concerns that you are alluding to.

\*          \*          \*

Jeff Harte - Sandler O'Neil & Partners LP

Most of my questions have been hit, two left; one I understand that the due diligence process from the credits and what's in the portfolio stand point. Can you talk a little bit more about how you got comfort on the litigation and potential regulatory side? Because we're looking at one of the biggest sub-prime issuers out there and with sub-prime having a lot of problems and government entities

looking into it and lawsuits potentially looming, how do you get comfortable with your potential exposures on those two fronts?

Kenneth D. Lewis

Well, all I can say is we had a lot of advice from both our internal group and also from two other entities that put some parameters around it.

116.    The questions from Sandler O'Neill & Partners LP's ("Sandler O'Neill") Jeff Harte concerning Defendants' due diligence and Countrywide's subprime issues and exposure, litigation and regulatory concerns were calculated and pointed.   Undisclosed during the teleconference was the fact that during Defendants' due diligence investigation, Countrywide had hired Sandler O'Neill, a boutique investment banking firm, to explore its options.   Before Defendants caused BOA to tender its purchase offer to Countrywide's Board, Sandler O'Neill's CEO, Jimmy Duane, met with Countrywide's CFO, Eric Sieracki, to review a presentation by Countrywide's management of a "base-case scenario," a "stress scenario," and a "severe scenario" concerning the company's then-teetering mortgage operations.   After reviewing the presentation, Mr. Duane dismissed the base-case scenario out of hand and informed Mr. Sieracki that coming events would likely be even worse than Countrywide's projected "severe scenario."

117.    On February 13, 2008, Defendants caused BOA to file with the SEC its Form S-4 relating to the proposed CW Acquisition in which Defendants reaffirmed many of material representations made by defendants Lewis and Price to the securities analysts present at the January 11, 2008 presentation and conference call, including a representation that a pro forma analysis of the mergers effect would be "neutral to slightly dilutive to [BOA] in 2008 and accretive in 2009."   More importantly, neither this Form S-4, nor any amendments thereto, ever provided any material corrections, qualifications or disclaimers to the statements made by BOA and/or its senior management in connection with the January 11, 2008 presentation and conference call.   As discussed previously, from at least 2006 through the January 11, 2008 CW

Acquisition announcement, Countrywide had suffered a series of severe business disruptions resulting from its improper mortgage origination practices, lax underwriting standards, and toxic debt securitization practices which Defendants' due diligence failed to identify, or if identified, were not fully appreciated.  Had Defendants conducted a proper and thorough due diligence investigation of Countrywide's core business operations they would have learned (and should have publicly disclosed) that:

- In late 2003 the company's senior management, Angelo Mozilo (Chairman and CEO) and David Sambol (President and COO), implemented a change in loan origination practices that forced loan underwriting employees to concentrate on increased originations at the expense of borrower creditworthiness.  Mozilo and Sambol concluded that by originating and procuring large volumes of loans, regardless of their relative risk, Countrywide would be able to cover any losses incurred by the riskier loans through the profits it generated on other mortgage loans;

- Countrywide had also implemented a loan "matching strategy" in which Countrywide would automatically match the terms of any loan being offered by another loan originator in the market, even loans offered by primarily subprime originators;

- Countrywide had implemented a loan underwriting process that incorporated multi-tiered loan approval process that was designed to disregard the red flag of a borrower's prior loan disapproval and, thereby, increasing the ultimate approval of the loan at the sake of a borrower's creditworthiness. For example, all loan applications were first processed by an automated system that would either approve the loan or refer it to manual underwriting. If rejected, the loan application was routed for manual underwriter review to determine if the loan could be approved under the underwriter's "exception" authority. If again rejected, the loan was then referred to the Secured Lending Desk where underwriters with broader exception authority attempted to get the loan approved. Finally, if all prior attempts failed, the application would be referred to the Secondary Markets Structured Lending Desk where the sole criterion for approving was whether it could be sold into the secondary loan market;

- Countrywide would systematically approve "exception" loans that did not satisfy even Countrywide's weakened "theoretical" underwriting criteria through a high-volume computer system called the Exception Processing System that approved virtually every borrower and loan profile and became known within the company as the "Price Any Loan" system. By 2006 nearly 23% of all Countrywide's subprime first-lien loans were generated as "exceptions";

- Countrywide routinely classified its mortgages for sale in the secondary loan market as "prime" even if they were issued to non-prime borrowers, including people who recently went through bankruptcy. Countrywide included in the "prime" category loans with borrower FICO scores falling below 620, no-documentation loans and pay-option adjustable-rate mortgages ("ARMs"); and

- That at the direction of Mr. Mozilo, in early December 2006, Countrywide's Chief Credit Risk Officer, John P. McMurray, reviewed the company's 2006 loan portfolio (the "2006 Vintage") and observed that over 62% of all subprime loans originated in the second quarter 2006 had loan to value ratio of 100%, and that the percentage of 60-and 90-day delinquencies in subprime loans originated in 2006 were at 8.11% and 4.03%, respectively, and exceeded the delinquency rates for any of the previous six years. Mr. McMurray also concluded that the delinquency rates for 2006 Vintage loans would likely continue to rise, driven by the company's lax underwriting guidelines and the worsening economic environment.

118.    In short, these (undisclosed) facts demonstrate that Countrywide had effectively stopped balancing risk by 2006, instead, it rushed full steam ahead by engaging in the riskiest possible mortgage lending practices to cash-in on (or, to a large degree, actually create) the biggest U.S. housing boom (and resulting bust) ever.

### E.    Defendants' Failure to Disclose Countrywide's Core Business Operational Problems, Which Results in the Countrywide Action

119.    The disastrous effects of the CW Acquisition  continue to plague the Company. For instance, in January 2011, Defendants were forced to write off *$5 billion* in bad loans issued by Countrywide.  This $5 billion was in addition to the nearly $5 billion previously written off concerning Countrywide.  Thus, the $4 billion CW Acquisition has resulted in write-offs totaling (at least) nearly *$10 billion,* which does not include the ongoing material exposures the Company faces stemming from the CW Acquisition.

120.    In addition to proving disastrous for the Company's financial results and condition, because the CW Acquisition drastically increased the Company's exposure to the subprime market, the CW Acquisition also roped the Company into very costly litigation.  In

particular, beginning on or about August 14, 2007 the Countrywide Action was filed.   The plaintiffs in the Countrywide Action asserted claims under the Securities Act and the Exchange Act against Countrywide, certain of its current and former directors and officers, its outside auditor KPMG, and underwriters of public offerings of Countrywide securities.   Specifically, the plaintiffs alleged, *inter alia,* that the defendants violated the federal securities laws by making false and misleading statements concerning Countrywide's business as an issuer of residential mortgages, the creditworthiness of borrowers, underwriting and loan origination practices, and loan loss and other accounting provisions.   The plaintiffs further alleged that the defendants misrepresented high risk low documentation loans as being "prime," in violation of generally accepted accounting principles.

121.   After nearly three years of costly litigation, on May 7, 2010, the plaintiffs to the Countrywide Action announced a proposed settlement of the action for *$624 million* in cash. On March 10, 2011, the Settlement was granted final approval.

122.   More recently, on June 29, 2011, defendants caused the Company to announce the MBS Settlement, the largest financial-services settlement ever, and yet another legacy exposure from Countrywide.   The MBS plaintiffs alleged that Countrywide designed a series of poor-quality mortgage-backed securities that were designed to (and did quickly thereafter) implode shortly after they were sold to unsuspecting investors.   These claims were initially brought by a group of 22 of the largest and most powerful institutional investors in the U.S., including the Federal Reserve Bank of New York, Pimco Investment Management, MetLife, Inc., and Blackrock Financial Management.   These investors had alleged in a letter sent nine months earlier to BOA that the securities they purchased before the financial crisis (originally valued at $105 billion) were impermissibly loaded with time-bomb loans that did not meet the sellers'

promises about the quality of the borrowers or the collateral. The investors also alleged that Countrywide failed to maintain accurate files while managing the loans. Eventually, the investors' group expanded to cover 530 bond deals originally valued at *$424 billion*.

123.    BOA has agreed to pay *$8.5 billion* for the MBS Settlement, which upon information and belief, remains subject to approval by the New York State Supreme Court, would be the largest such settlement by any financial-services firm in history, and *would exceed the total profits of BOA* since the onset of the financial crisis in 2008. In connection with the announcement of this record-breaking settlement, Defendants indicated that the Company would have to record an additional $5.5 billion provision to its representations and warranties liability for both GSE and non-GSE exposures in the second quarter of 2011.

124.    In total, Countrywide was an unmitigated disaster for BOA, as it has cost it over $20 billion. In sum, it is one of the most destructive acquisitions ever perpetrated on U.S. stockholders.

125.    Presumably, Defendants will fund the massive MBS Settlement with the $20 billion reserve they announced on June 29, 2011. As discussed previously, on that date, Defendants announced the creation of a $20 billion litigation reserve to address this, and other legacy crisis-era exposures.

**F.    The Company's Equally Disastrous Merrill Lynch Acquisition**

**1.    BOA Hastily Seizes The Opportunity To Acquire Merrill, And Agrees To Pay A Significant Premium For The Company**

126.    As *The Wall Street Journal* reported on September 15, 2008, defendant Lewis had "long coveted" Merrill. Indeed, Merrill, a 94-year old pillar of Wall Street, possessed significant prestige and respect for which Lewis and the Charlotte-based BOA had "long clamored," and its acquisition was "the final piece" of Lewis's plan to make BOA the country's biggest bank by

assets and arguably its most powerful financial institution, as Lewis himself acknowledged during an October 19, 2008 interview on *60 Minutes*:

> Question:      You always wanted Merrill Lynch.
>
> Lewis:         We've always thought that was the best fit for us.
>
> Question:      You were drooling for Merrill Lynch.
>
> Lewis:         We have always thought it was . . . . Yep.

127.    As the financial markets collapsed in 2008, defendant Lewis got the chance to acquire the company he long-coveted.  On Sunday, September 7, 2008, the U.S. Government seized the country's two largest mortgage companies, known as Fannie Mae and Freddie Mac, placed them into conservatorships, and agreed to inject as much as $100 billion into each institution to remedy its capital shortfall.  Days later, on September 11, 2008, American International Group, Inc. ("AIG") saw its stock price plummet 31% in the face of looming rating agency downgrades and resulting collateral calls, and immediately began negotiating a deal to, in effect, sell itself to the U.S. Government for $85 billion to avert imminent bankruptcy.

128.    The next day, Friday, September 12, 2008, it became clear that Lehman, one of Wall Street's most venerable institutions, would have to find a buyer or be forced to file for bankruptcy by September 15, 2008.  Lehman's bankruptcy – the largest in U.S. history – was certain to further destabilize the financial markets by causing lenders to halt crucial daily funding to other financial companies with large exposure to similar mortgage-linked assets, leaving those companies vulnerable to collapse.

129.    As Merrill CEO Thain realized, Lehman's bankruptcy would almost certainly trigger Merrill's own collapse.  Indeed, in a February 19, 2009 deposition taken by the New York Attorney General's office, Thain testified that he knew that Lehman's failure would likely render Merrill effectively insolvent "beginning Monday morning," September 15, 2008.  As

Thain stated in a speech he delivered at the Wharton School of the University of Pennsylvania on September 17, 2009, given the "amount of bad assets on [Merrill's] balance sheet," Lehman's bankruptcy would be "catastrophic" for Merrill. Accordingly, Thain immediately began searching for a buyer for Merrill. Critically, Merrill's predicament was no great secret; Wall Street speculation that Merrill would soon possibly fail had cratered Merrill's stock price, which had fallen from about $40 per share in June 2008 to $17 per share in September 2008.

130. As Thain later stated, he knew that defendant Lewis "always wanted" to acquire Merrill. Thus, on the morning of Saturday, September 13, 2008, Thain called defendant Lewis at his North Carolina home and said, "Ken, I think we should talk about a strategic arrangement." Lewis, who had been rebuffed in several previous attempts to acquire Merrill, jumped at the opportunity, telling Thain he could meet him in New York that afternoon.

131. By 2:30 p.m. that day, Thain and defendant Lewis were sitting alone and face-to-face in BOA's corporate apartment in the Time Warner Center in New York. Thain proposed that "we would be interested in selling a 9.9 percent stake in Merrill to Bank of America." Lewis flatly refused to become a minority investor: "I responded to John, 'That's not really what I have envisioned here. I want to buy the whole company, not invest 9 to 10 percent.'" Thain ultimately agreed to sell all of Merrill to BOA that Saturday afternoon – provided it was at a significant premium to Merrill's closing price of $17 per share on Friday, September 12, 2008.

132. Accordingly, on September 14, 2008, only *one day* after Thain had first contacted defendant Lewis to discuss a strategic investment, defendant Lewis agreed on BOA's behalf to pay *$50 billion* for Merrill in an all-stock transaction whereby each share of Merrill would be exchanged for 0.8595 shares of BOA. The agreement valued Merrill stock at $29 per share – an incredible *70% premium* to Merrill's $17 per share closing price on September 12, 2008.

2.    **BOA And Merrill Secretly Agree To Pay Up To $5.8 Billion Of Bonuses To Merrill Executives And Employees Before The Year-End**

133.    The Merrill deal -- which was lousy and/or incredibly rich to begin with -- would become materially worse for BOA stockholders. Unbeknownst to the public, BOA's and Merrill's senior officers spent a large portion of their limited time during the Merger discussions negotiating the **bonuses** that Merrill's senior officers and employees would receive as part of the deal. In fact, Thain stated on September 17, 2009 that these bonuses were one of the three "main things" the parties negotiated, with the other two being the "price" to acquire Merrill and the MAC. Defendant Lewis and Thain were involved in and kept continually apprised of these bonus negotiations. Lewis negotiated the bonus agreement through Greg Curl ("Curl"), BOA's Vice Chairman of Corporate Development. According to Thain's deposition testimony, he was kept informed of the negotiations, and all the terms of the agreement, through Greg Fleming ("Fleming"), Merrill's President and Chief Operating Officer.

134.    According to a February 8, 2009 article in *The New York Times*, during these bonus negotiations, "a page was ripped from a notebook, and someone on Merrill's team scribbled eight-digit figures for each of Merrill's top five executives, including $40 million for Mr. Thain alone." By that point, Thain had served at Merrill for all of 9 months. Subsequent media reports revealed that the list also provided for $30 million for Fleming, and $15 million to $20 million each for Merrill's Chief Financial Officer Nelson Chai, President of Global Wealth Management Robert McCann, and General Counsel Rosemary Berkery. In total, Merrill sought the right to pay up to *$5.8 billion* in discretionary year-end and other bonuses to its executives and employees.

135.    Significantly, during these discussions, Merrill's senior executives also insisted

that BOA agree to allow Merrill to *accelerate payment* of these bonuses so that they could be paid in December 2008; before the Merger was scheduled to close on January 1, 2009, and, critically, **before** Merrill's (disastrous) financial results for the fourth quarter became public. This accelerated schedule deviated from Merrill's compensation practices and regular bonus schedule, under which annual bonuses were not even calculated, let alone paid, until January, **after** the close of the fiscal year.

136.    Indeed, according to Merrill's 2008 Definitive Proxy, which was filed with the SEC on March 14, 2008 (the "Merrill Proxy") and later incorporated by reference into the Merger Proxy, "pay for performance" was "the core of [Merrill's] compensation policy," and executive bonuses were "paid in January for performance in the prior fiscal year." The Merrill Proxy also stated that "[t]he goal of [Merrill's] compensation programs is to provide an integral link between pay and performance and to fully align the interests of employees with those of shareholders," and that "the financial performance of the Company as a whole had to be the dominant consideration in formulating [Merrill's] compensation determinations."

137.    The negotiations over the size of the bonus pool dragged on for hours, delaying the signing of the Merger Agreement until almost 2 a.m. on September 15, 2008, even though, at approximately 1 a.m., Lehman filed for bankruptcy, thereby bringing Merrill to the precipice of collapse.

138.    Ultimately, Defendants caused BOA to agree to permit Merrill to pay, pursuant to Merrill's Variable Incentive Compensation Program ("VICP"), up to $5.8 billion in discretionary bonuses to its executives and employees prior to the close of the Merger. This highly material amount was equal to *12% of the value of the Merger*, and was in fact *26% more* than BOA had earned during the first two quarters of 2008. It also represented *77%* of Merrill's record earnings

of $7.5 billion for all of 2006; nearly 30% of Merrill's total stockholders' equity as of December 26, 2008; and over 8% of Merrill's total cash as of December 26, 2008.

139.    The $5.8 billion in bonuses that Defendants agreed to allow Merrill to pay was actually materially *greater* than the bonuses that Merrill itself had *internally planned* to pay prior to the collapse of the financial industry that occurred in the second half of 2008.  Prior to the Merger negotiations, Merrill had *reduced* its internally-projected bonus pool from $5.8 billion to $5.1 billion, or by 16.5%.  Thus, the agreement with BOA permitted Merrill to pay bonuses that were at least *$700 million greater* than Merrill itself had contemplated, and that carried a recorded expense that was larger by $1 billion.

140.    Defendants also permitted Merrill to pay these bonuses before the Merger's scheduled closing date of January 1, 2009, ahead of Merrill's normal schedule.  As Thain testified in his February 19, 2009 deposition: "The timing . . . was determined when we signed the merger agreement. The timing was contemplated then, in September, to be prior to the close, and the expectation was always that the close would be on or around December 31."

141.    Paying the bonuses in December meant that Merrill executives would be able to reap gigantic, windfallbonuses despite Merrill's 2008 financial performance, ie.,e, its near-collapse.  Additionally, the accelerated schedule eliminated any chance that BOA might reduce or eliminate Merrill's bonus payments once BOA assumed control of Merrill after the Merger closed.  As the *Associated Press* reported on January 22, 2009, "had Thain not acted early, it would have been up to Bank of America to pay or reduce the bonuses later."  As Merrill's executives knew, BOA's compensation policies were substantially less generous than Merrill's,[10]

---

[10]    This is not to say that BOA's compensation policies were adequate either.  As discussed more fully herein, Defendants caused BOA to repeatedly overcompensate senior members of management, despite declining (and admittedly false) financial results.

making it likely that BOA would severely curtail Merrill's bonuses – especially if Merrill suffered large losses during the fourth quarter – unless Merrill secured the right to pay them on an accelerated basis at the time Merrill negotiated the other merger terms.  This was confirmed by BOA's Head of Human Resources, Andrea Smith ("Smith"), who testified in a deposition taken by the New York Attorney General's office that there was a "giant gap" between Merrill's bonus numbers and BOA's; so big, in fact, that Smith gave "an example of someone in a role at Merrill that got paid three dollars, and that same role in Bank of America would have gotten paid one dollar."

142.    Additionally, paying billions of dollars in bonuses before the Merger closed meant that BOA shareholders would receive an asset worth billions of dollars less than contemplated.

143.    On PBS *Frontline*, defendant Lewis stated that the bonuses were so large that they ruined the celebratory toast he had hoped to enjoy on September 15, 2008: "[P]etty kind of things and selfish things start to crop up at the very end [of the merger process].  And frankly, it extends things to the point that I have never really been real happy by the time that champagne pours.  Usually, you're mad at each other by then and you drink it politely and then leave. . . . And that was about how I felt with this one."

### 3.   Lewis Presents the Merrill Merger To Investors While Concealing The Bonus Agreement

144.    On the morning of Monday, September 15, 2008, Defendants caused BOA and Merrill to issue a joint press release announcing that BOA had agreed to acquire Merrill for $50 billion in stock in a deal scheduled to close on January 1, 2009.  In an investor conference call and press conference that day, defendants Lewis and Price, along with Thain, made numerous statements designed to assure investors that the large premium was justified because Merrill was

financially stable.

145.    For example, defendant Lewis emphasized that BOA had conducted a "comprehensive[]" analysis of Merrill's financial condition, which had established that Merrill had "dramatically" reduced its risky assets and write-downs, thus creating "a much lower risk profile" than it previously possessed. Defendant Lewis added that "we have very similar methodology valuations and we have very similar marks.  The structures – we're dealing with the same counterparties on things. So again, back to the earlier point, we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself."

146.    On September 18, 2008, Defendants caused BOA (along with Merrill) to file copies of the Merger Agreement with the SEC on Forms 8-K, which explained that the Merger Agreement was being provided to investors so that they could understand its terms. The Merger Agreement did not say a word about the $5.8 billion in bonuses that Defendants had agreed to let Merrill pay its executives and employees or that these bonuses would be paid on an accelerated basis, before the Merger closed.  To the contrary, the Merger Agreement contained a materially misleading statement in a section entitled "Company Forbearances," which represented that Merrill would not, without the prior written consent of BOA:

> (i) increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of [Merrill] or its Subsidiaries (collectively, "Employees"), [or] (ii) pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business).

147.    Thereafter, between September 18 and November 3, 2008 (when the definitive Proxy was filed with the SEC and mailed to shareholders), Defendants caused BOA and Merrill to continue to make numerous positive statements reassuring investors about their financial condition, the Merger, and the combined company.

148.    For example, on October 7, 2008, Defendants caused BOA to conduct a

Secondary Offering, selling 455,000,000 shares of common stock at $22 per share, for net proceeds of $9.9 billion.   In the press release announcing the offering, defendant Lewis underscored BOA's "strength and stability," and stated that the Merger "should significantly enhance our earnings."   On a related investor and analyst conference call, defendant Price, responding specifically to a question regarding any need for additional capital in connection with the Merger, affirmatively stated that no new capital would be necessary.

149.    Similarly, on October 16, 2008, Merrill issued a press release in which Thain stated that Merrill "continued to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal."

150.    Then, on October 13, 2008, the U.S. Government took the extraordinary step of requiring the nation's largest banks and financial institutions to accept billions of dollars in government aid pursuant to TARP.   On October 19, 2008, defendant Lewis appeared on *60 Minutes* and assured investors that *BOA had actually benefited from the financial crisis* because, in contrast to other banks, consumers were attracted to BOA's stability and thus were making deposits at a record pace, enhancing BOA's capital position.   Defendant Lewis represented that the Merrill transaction proved that BOA's capital strength had enabled it to defeat and absorb weaker banks, and *that BOA had "won" in its competition with "Wall Street."*

151.    Defendant Lewis further stated that BOA did not need the TARP funding it had recently received, but that Secretary Henry Paulson ("Paulson") had forced Lewis to accept it with "no negotiations."   Defendant Lewis explained that he acceded to Secretary Paulson's ultimatum only because he did not "want to expose" other banks in the group that "really needed the capital," and therefore accepting the funds "was the right thing for the American financial system, and [] the right thing for America."   In contrast to institutions that needed TARP funds to

repair their capital bases, defendant Lewis stated that *BOA would "use [the TARP funds] to grow loans and to make more net income."*

152.    The financial piece of the Merrill fiasco -- to say nothing of Defendants' shocking omissions regarding Merrill's quickly-deteriorating operation condition after the deal was announced before it was voted upon -- was one of the greatest transfers of stockholder wealth in history, and some of the Defendants named herein were directly responsible for it.   Yet, to date, not a shot has been fired in anger at BOA over this travesty.   As illustrated below, this vast transfer of wealth was compounded by the fact that Defendants knew -- actually knew -- that Merrill was losing billions a day in the weeks leading up to the Merger vote and, in a truly shocking breach of duty, they failed to disclose this undeniably material information even though they were advised by counsel that they must.[11]

### 4.    During October And November 2008, Merrill's Losses Grow To At Least $15.5 Billion Before the Shareholder Vote to Approve the Merger

153.    Unbeknownst to the public, throughout October and November 2008 – while Defendants were soliciting shareholder approval of the Merger – Merrill was suffering undisclosed losses that were so large that they threatened the viability of Merrill, and were so severe that BOA could not absorb them and proceed with the Merger.

154.    In October 2008, the first full month after the Merger was announced, Merrill suffered losses of more than $7.5 billion.   As Thain admitted in his interview with PBS *Frontline*:

> If you look at what actually happened in the fourth quarter, October was the worst month, which is not surprising, because it comes right after the Lehman bankruptcy. We lost about $7 billion in the month of October. . . . October was by far the worst.

---

[11]    Thus, Defendants cannot rely upon an advice of counsel defense on the Merrill disclosure issue, nor could they reject the Demand on this basis.

155.   These losses were highly material.   The losses Merrill reported in the single month of October were greater than the "record" profit Merrill reported in the entire year of 2006.   In fact, after excluding quarter-end adjustments, these losses represented the greatest monthly loss in the company's history (and the second greatest monthly loss if such adjustments were included).   The losses were also almost three times greater than the $2.7 billion in pre-tax losses Merrill had suffered in September 2008 – the month that Lehman filed for bankruptcy and the markets collapsed, threatening Merrill's solvency and precipitating the sale of Merrill to BOA.   Significantly, over the course of the first three quarters of 2008, Merrill had lost an average of approximately $6.5 billion per quarter on a pre-tax basis.   The losses Merrill suffered in the month of October 2008 alone exceeded the average quarterly loss Merrill had reported in 2008 by roughly $1 billion.

156.   In November 2008, Merrill continued to suffer billions of dollars in losses. According to an expert analysis of Merrill's weekly loss data for the fourth quarter – which was prepared by Congress to determine "what loss trends could reasonably be deduced from the loss data available to [BOA's] decision makers" at the time – by November 14, 2008 Merrill: (i) had lost at least another $2 billion; (ii) was on pace to continue to lose at least $1 billion per week through the end of the quarter; and (iii) had losses that were accelerating.

157.   Merrill's total pre-tax loss for the two months of October and November exceeded $15.5 billion – an amount that was substantially more than the record $12.8 billion pre-tax loss Merrill reported for the entire 2007 fiscal year.   As *The Wall Street Journal* reported on February 5, 2009, after reviewing an "internal document," which reported the losses, "internal calculations showed Merrill had a horrifying pretax loss of $13.3 billion for the previous two months, and December was looking even worse."   In addition to this highly material $13.3 billion loss,

according to a September 8, 2009 letter from the New York Attorney General's office, in "November 2008, Merrill determined that it would need to take a goodwill charge of approximately $2 billion, due partially to the complete failure of Merrill's 2006 acquisition of First Franklin Financial Corporation, one of the leading originators of sub-prime residential mortgage loans." Merrill's Chief Accounting Officer, David Moser ("Moser"), has testified that on November 13, 2008, more than three weeks prior to the shareholder vote, he informed defendant Price that Merrill would take an approximately $2 billion goodwill write-down. On November 20, 2008, Moser confirmed in an email that "we will be taking a significant write-off of the goodwill...approximately $2.2 billion." Including this $2.2 billion goodwill charge, Merrill's total losses by the end of November 2008 totaled at least *$15.5 billion*.

158.   Judged by any measure, Merrill's undisclosed losses were highly material to BOA, as they brought Merrill to the brink of insolvency, and, as Lewis would publicly acknowledge when belatedly disclosing the taxpayer bailout, BOA could not absorb them without the government's assistance. Indeed, Merrill's fourth quarter pre-vote losses were substantially greater than the $5.8 billion BOA had earned through the first nine months of 2008, and more losses were expected before year-end. Further, these losses were entirely undisclosed to the market and the Company's shareholders. For example, after Merrill highlighted the "significant progress in balance sheet and risk reduction" it had supposedly achieved in its October 16, 2008 press release, analysts had concluded that Merrill had significantly improved its financial condition in preparation for the Merger with BOA.

159.   Analysts' consensus expectations as reported by Thomson First Call were for Merrill to earn a fourth quarter profit of $0.44 per share. For example, in an October 16, 2008 analyst report on Merrill, Credit Suisse forecasted that Merrill would earn a fourth quarter profit

of $0.63 per share and noted: "The strongest positive in the [third] quarter was the progress made on working down the investment bank's 'high risk' inventory. . . . With these write-downs and several billion in sales, detailed exposures were reduced by 20% quarter to quarter [and] the high risk positions came down an even more substantial 39%."   That same day, Deutsche Bank forecasted that Merrill would earn a fourth quarter profit of $0.54 per share and reported, "Merrill's [third] quarter reflects, in our view, a clean-up prior to its year-end merger with Bank of America."

> **5.   Defendants Were Fully Aware Of Merrill's Staggering Losses Before The Shareholder Vote on the Merrill Merger**

160.   Defendants Lewis and Price, along with Neil A. Cotty ("Cotty") and Thain, knew of Merrill's losses as they occurred.   Indeed, Cotty became acting CFO of Merrill immediately after the Merger was announced, and acted as a direct liaison between Merrill and defendants Lewis and Price.   In addition, according to a February 8, 2009 *New York Times* article, "Bank of America, shortly after the deal was announced, quickly put 200 people at the investment bank, including a large financial team," to continuously monitor Merrill's financial condition.   As Thain wrote in a January 26, 2009 memo to Merrill employees addressing Merrill's fourth quarter losses:

> We were completely transparent with Bank of America. They learned about these losses when we did. The acting CFO of my businesses was Bank of America's former Chief Accounting Officer. They had daily access to our p&l [profit and loss statements], our positions and our marks.

161.   Moreover, Thain testified in his deposition taken by the New York Attorney General that BOA executives not only had access to this detailed financial information, but personally received regular updates as the fourth quarter progressed.   Thain testified that Merrill held meetings each Monday to discuss the prior week's financial results, and "[t]he acting chief financial officer, Neil Cotty, sat in meetings and discussions and was totally up-to-speed on what

was happening" throughout the fourth quarter.

162.    During Thain's PBS *Frontline* interview, he explained in greater detail that both he and Merrill's senior executives, as well as BOA and its senior executives, all received daily, "step-by-step" updates on Merrill's financial condition:

> Question:    And was Bank of America inside your books? . . . Would they have known what was happening, what the projections were, how bad things actually were because of the Lehman collapse and what else had happened in the market?
>
> Thain: *Yes, absolutely.* I believe in being totally transparent. They had acquired us. We were completely transparent with them. They had inserted the person who had been their chief accounting officer – he became the acting chief financial officer for the Merrill businesses. We generate a daily profit and loss statement. They were getting that daily profit and loss statement, *so they knew about the losses at the same time we did.*
>
> Question:    Which was when?
>
> Thain:        We get an update every day.
>
> Question:    So they would have known all the way along?
>
> Thain:        All the way along.
>
> Question:    Step by step?
>
> Thain:        Yes.

163.    Indeed, Defendants have admitted that they were aware of Merrill's financial condition.  As reported in the February 8, 2009 *New York Times* article, "a Bank of America spokesman said that 'we have not disputed that we were kept informed about the financial condition of the  company.'"

164.    Although defendant Lewis initially told federal regulators that he was "surprised" by the size of Merrill's losses, he has since admitted in sworn testimony before Congress that he was aware of the losses that occurred during October and November 2008.  Lewis was asked by one Representative whether BOA received "detailed financial reports every week from Merrill Lynch after signing the Merger Agreement on September 15th?"  Lewis replied, "That is true."

The Representative also asked defendant Lewis, "Now Mr. Lewis, isn't it true that you understood the composition and performance of Merrill's portfolio because it was similar to your own . . . ?  Isn't that true?"  Again, Lewis replied, "It is true."  At a later point in Lewis's testimony, another Representative asked whether any of the 200 financial analysts that BOA stationed at Merrill immediately after the Merger announcement reported Merrill's losses to Lewis before the shareholder vote. Lewis responded, "*I apologize if I haven't been clear. The – we did have people there, and we did know that there were losses.  And that was clear both at our company and theirs.*"

165.    Similarly, in a February 26, 2009 deposition taken by the New York Attorney General's office, defendant Lewis stated that: "*We were getting projections. I was getting a P and L at Bank of America, but we were getting projections [for Merrill]. I don't recall getting them every day, but I was either hearing about them and in some cases I saw them.*"

### 6.    Internal BOA Documents And Sworn Testimony Establish That Defendants Recognized That Merrill's Losses Should Have Been Disclosed In Advance Of The Shareholder Vote

166.    It has been alleged that internal BOA documents and the sworn testimony of BOA executives establish that BOA's most senior officers were not only aware of Merrill's losses as they occurred, but immediately recognized how devastating those losses would be to the combined company.  For example, on November 5, 2008, Cotty sent an email concerning Merrill's October results to defendant Price with the striking notation: "Read and weep." Similarly, Merrill's Corporate Controller acknowledged in a November 9, 2008 email to Cotty how poor Merrill's results were, telling him that the "[n]umbers speak for themselves."

167.    On November 12, 2008, defendant Price and Cotty received a forecast for Merrill's fourth quarter.  In addition to setting forth Merrill's actual loss of $7.536 billion in

October, the report stated that Merrill's fourth quarter losses were expected to be more than $8.9 billion pretax, or $5.4 billion after tax, assuming "no additional marks" or "other significant market dislocation items." These losses were so severe that they caused defendant Price to immediately question whether they should be disclosed. "It prompted me to ask the disclosure question," Price testified to the SEC.

168.    Thus, that same day, defendant Price informed BOA's General Counsel, Timothy Mayopoulos ("Mayopoulos"), that Merrill was forecasting a loss of approximately $5 billion after-tax for the quarter. Mayopoulos knew at once that BOA was likely required to disclose these losses to shareholders voting on the Merger. As Mayopoulos testified to the New York Attorney General, he responded to this news by telling Price that "$5 billion is a lot of money," and "a disclosure was likely warranted."

169.    Similarly, BOA's outside counsel, Wachtell, Lipton, Rosen & Katz ("Wachtell"), concluded that Merrill's losses should be disclosed to investors. After meeting with Price on November 12, 2008, Mayopoulos consulted Wachtell regarding disclosure of Merrill's losses. According to the handwritten notes of Wachtell senior partner Eric Roth ("Roth"), Wachtell was told that Merrill "had a terrible October," and that "ML lost $7B in October!" Roth's notes further show that Wachtell was asked, "do we have to get the # out?"

170.    According to Roth's notes, Wachtell conducted research on whether disclosure of Merrill's losses was required, and Roth reviewed a formal memo previously prepared by the firm which concluded that, under Section 14(a) of the Exchange Act, "there was a duty" to disclose material facts arising after the issuance of a proxy. Significantly, as set forth in Roth's notes, Wachtell's research had concluded that BOA had a "duty to bring to sh. all info material to vote" "@ time of vote under federal proxy" law.

171.     The next day, November 13, 2008, Mayopoulos and other BOA in-house counsel met with Roth and other senior Wachtell partners to discuss disclosure of Merrill's losses.  At this meeting, as reflected in contemporaneous notes taken by Roth, BOA's in-house counsel and Wachtell agreed that Merrill's losses had to be disclosed prior to the shareholder vote.

172.     According to Roth's handwritten notes of this meeting, the lawyers discussed the fact that the consensus among analysts was for Merrill to report a profit for the fourth quarter, but that, unbeknownst to investors, Merrill would "be deep in the red."  In fact, according to BOA's own internal analysis of analysts' expectations at this time, the vast majority (9 out of 13) of analysts covering Merrill were forecasting the company to earn a profit for the fourth quarter of 2008.  For example, as Defendants were aware, Credit Suisse was predicting that Merrill would earn a profit of $0.63 per share, Deutsche Bank was predicting that Merrill would report a profit of $0.54 cents per share, and Oppenheimer was predicting that Merrill would report a profit of $0.32 cents per share. In fact, Deutsche Bank had raised its estimate for Merrill's fourth quarter results on October 16, 2008, after learning of Merrill's third quarter results, which reflected "a clean-up prior to its year-end merger with Bank of America."

173.     Roth's notes further show that, at this meeting, Mayopoulos recommended that "given ML's # – rec. both co. report [their financial results] week or so before" the vote.  As Mayopoulos testified to the New York Attorney General, "I communicated to Wachtell that I believe my initial assessment was that a disclosure was warranted."

174.     Wachtell agreed that BOA was required to issue  a disclosure regarding  Merrill's quickly-deteriorating financial condition.  Significantly, as Roth wrote, the lawyers "all agree must be some discl[osure]" of Merrill's losses beyond what was in the Proxy.  After discussing the contents of such a disclosure, the lawyers discussed the date for the disclosure and reached

"consensus – 11/28!" because it was a "week before sh. meeting."

175.    That same day, November 13, 2008, defendant Price and Cotty were informed by Merrill's Chief Accounting Officer, Moser, that Merrill would take an approximately $2 billion goodwill write-down during the fourth quarter.   That charge brought Merrill's actual pre-tax losses for the quarter incurred to date to more than $10 billion and the quarter was not even half over.

176.    A fair question at this point may be to wonder what the Board was doing with all of this clearly material information and the answer is nothing: it simply did not factor this information into this bet-the-company-type debate, in breach of their fiduciary duties.

### 7.    As Merrill's Losses Mount, Defendants Acknowledge That Disclosure Of Merrill's Losses Would Cause Shareholders To Vote Against The Merger – And Abruptly Reverse Their Decision To Disclose The Losses

177.    On November 14, 2008, defendant Price met with Thain.   Although it had been agreed that Price would inform Thain of BOA's decision to disclose Merrill's financial condition before the shareholder vote, defendant Price did not inform Thain that BOA's in-house and outside counsel had determined that a disclosure concerning Merrill's financial condition had to be made.   Instead, according to the sworn testimony of Christopher Hayward, Merrill's Finance Director, Price merely asked Thain "does Merrill plan to do any intra-quarter disclosure," to which Thain responded "No."   Defendant Price did not discuss the issue further with Thain.

178.    By November 16, 2008, Defendants knew that Merrill's fourth quarter losses were continuing to materially increase.   That day, defendant Price emailed Cotty that Merrill "had a pretax loss of $10.942 billion" for the fourth quarter, not including the approximately $2 billion goodwill charge Merrill had decided it needed to take.   Thus, by November 16, 2008, defendant Price and Cotty knew that Merrill's losses for the fourth quarter would be at least $13

billion pre-tax, and $8.5 billion after-tax.

179.    On November 18, 2008, defendant Price met again with Mayopoulos to discuss disclosure of Merrill's losses.  Significantly, Price did not tell Mayopoulos that Merrill's pre-tax losses for the quarter had increased from $8.9 billion to $13 billion in the five days since they had last met.  Instead, at the meeting, Price and Mayopoulos discussed the fact that disclosure of Merrill's losses would impact shareholders' assessment of the transaction, and likely result in shareholders voting the Merger down.  As Mayopoulos testified, if Merrill's losses were disclosed, "I knew there was a possibility that shareholders would vote down the merger."  Indeed, set forth prominently in the top right-hand corner of Mayopoulos's handwritten notes from his meeting with Price was the question, underlined by Mayopoulos for emphasis: "What happens if neg. shh vote"?

180.    Two days later, Price and Mayopoulos abruptly reversed course and decided that BOA did not have to disclose Merrill's losses.  On November 20, 2008, Mayopoulos and Price met in person, and spoke on the phone with senior Wachtell partners Ed Herlihy ("Herlihy") and Nicholas Demmo ("Demmo").  Once again, defendant Price did not inform counsel that the losses were now in excess of $13 billion, including the $2.2 billion goodwill charge, leaving counsel with the impression that Merrill's losses were billions of dollars less than they truly were.  Indeed, as Herlihy and Mayopoulos testified, at this time they still understood that Merrill's losses would "only" be $8.9 billion pre-tax (or approximately $5 billion after-tax), or more than $4 billion less than what they actually were.[12]  They also had no idea that the losses

---

[12]    Even this was a false premise because, even had the Merrill losses "only been $8.9 billion," a loss of that size would have certainly been material information to BOA stockholders, especially considering that, as alleged herein, Defendants knew that analysts were predicting that Merrill would report a fourth quarter profit of between $0.32 to $0.63 per share and because BOA's offer at $29 per share valued Merrill at $50 billion.

had increased by nearly 50% in less than one week.

181.    At the meeting, Mayopoulos informed Herlihy and Demmo that no disclosure of these losses would be made.  A principal basis for this determination was that Merrill's fourth quarter losses were supposedly not material because Merrill had suffered between $2 billion and $9.8 billion of after-tax losses in the last five quarters, and the $5 billion of after-tax losses which Mayopoulos had been told Merrill would report were within that range.  Significantly, despite Price's knowledge of Merrill's true losses, he made no mention of the fact that Merrill's fourth quarter losses were more than $13 billion on a pretax basis, and $8.5 billion on an after-tax basis; or approximately 70% higher than Mayopoulos and Wachtell believed.

182.    Moreover, Defendants' unsupported and arbitrary "materiality" analysis had no legal basis.  As Mayopoulos admitted in his sworn testimony before the New York Attorney General, in reversing the prior decision to disclose Merrill's losses, neither he nor anyone else at BOA performed any legal research regarding BOA's disclosure duties.  He did not read a single court decision or SEC rule, nor did he ask any in-house counsel at BOA to research the issue, and he and/or Defendants rejected the advice of one of the world's leading law firms (Wachtell) because he/they simply did not like that advice.

183.    In addition, upon changing their recommendation regarding disclosure, neither defendant Price nor Mayopoulos asked Wachtell or any other counsel to opine as to BOA's disclosure responsibilities – notwithstanding the fact that, as of November 12, 2008, Mayopoulos, Price, and Wachtell had already determined that some disclosure of the losses prior to the vote was necessary.  As Herlihy testified before the New York Attorney General, "we were not disclosure counsel.  We never worked on any of their filings or disclosures relating to the filings."  Herlihy further testified that BOA did not request a legal opinion from Wachtell

concerning BOA's reversal of its decision to disclose Merrill's losses.

8. **As The Shareholder Vote Approaches, Senior Management Is Informed That Merrill's Quarterly Losses Will Exceed $16 Billion, And Ignores Repeated Entreaties To Disclose The Losses**

184.   Although Defendants had unilaterally determined that Merrill's losses were supposedly immaterial so long as they were not the greatest quarterly loss in Merrill's history, by late November, Merrill's mounting losses caused defendant Price to ask Mayopoulos to review the MAC clause in the Merger Agreement and advise him whether BOA had grounds to terminate the Merger by invoking the MAC. According to a February 5, 2009 article in *The Wall Street Journal*, "shortly before Thanksgiving," BOA's senior "executives debated whether Merrill's losses were so severe that the bank could walk away from the deal, citing the 'material adverse effect' clause in its merger agreement." The article further stated that the debate over whether to invoke the MAC continued "up until a few days before shareholders of Merrill and Bank of America were scheduled to vote."

185.   Later that day, Cotty emailed updated loss figures to defendant Price. According to Cotty's email, Merrill's October and November losses now totaled approximately $12.7 billion pre-tax, excluding the $2.2 billion goodwill write-down of which they both knew. Including that write-down, Merrill's total pre-tax losses for October and November were now approximately $15 billion. Cotty's email also contained a forecast for Merrill to lose an additional $1 billion in December, bringing Merrill's pre-tax losses for the quarter to at least $16 billion.

186.   Certain BOA executives insisted that if the Company was not going to terminate the Merger, shareholders should at least be told of Merrill's losses so that they could cast their vote with knowledge of the material facts. According to the February 5, 2009 *Wall Street*

*Journal* article quoted above, "[t]here was disagreement inside the bank about whether to tell shareholders about Merrill's losses," and this disagreement continued right up until "the night before the vote." As *The Wall Street Journal* reporter, Dan Fitzpatrick, later explained on PBS *Frontline*, "there were people inside Bank of America who felt like this number was big enough to disclose, that investors should know about this before they vote."

187. Of course, a situation like the disclosure disagreement is the precise reason why stockholders *need* a strong board of directors; that there is a *powerful* third-party protecting the interests of stockholders when management's judgment is unsound, does not honestly know what to do, or when it appears that managers are favoring their own interests at the expense of the Company or its stockholders. The Merrill disclosure debate was the perfect opportunity for the *Board to act like fiduciaries* and protect their charges, but they sat absent on the sideline, to the tremendous detriment of BOA and its stockholders.

188. Indeed, as Merrill's losses mounted, both BOA senior officers and Merrill's auditor concluded that Merrill's losses should be disclosed to shareholders voting on the Merger so that they could cast an informed vote. In late November 2008, BOA Treasurer Jeffrey Brown ("Brown") told defendant Price that "we should disclose" because "the losses were meaningful enough." Price refused to do so. In response, Brown warned him that he "didn't want to be talking through a glass wall over a telephone" if the losses were not disclosed; an admonition from one of BOA's own senior executives that the failure to disclose the losses could rise to the level of a criminal offense.

189. Similarly, at approximately the same time, Merrill's auditor, Deloitte & Touche ("Deloitte"), recognized that Merrill's losses were sufficiently material and that they warranted disclosure to shareholders. According to the sworn testimony of Deloitte partner Thomas

Graham ("Graham"), a "few days prior to the vote," Graham and Deloitte supervisor Ven Kocaj informed Merrill's Chief Accounting Officer Moser and Corporate Controller Gary Carlin ("Carlin") that Merrill's losses were "material subsequent events to what occurred at the end of September that would be relevant for parties that were voting on [the merger]" and "sizable enough [to] probably warrant disclosure." As Graham further testified, he told Moser and Carlin that, "given the losses through what it looks like will be November when it closes, given the fact you have another couple of billion dollars coming down the road in goodwill impairment, we believe it's prudent that you might want to consider filing an 8-K to let the shareholders, who are voting on this transaction, know about the size of the losses to date."

190.   On December 3, 2008, two days before the shareholder vote, defendants Lewis and Price, along with Cotty and Thain, met specifically to discuss Merrill's staggering fourth quarter losses. At this meeting, Cotty informed Lewis, Price, and Thain that Merrill's losses for November would be billions of dollars more than reflected in current forecasts, news that, according to Cotty's sworn testimony, created a "very somber environment." After reviewing Merrill's loss information, defendants Lewis and Price decided to revise Merrill's loss report to include an additional $2 billion of losses for November.

191.   The revised loss report, entitled "2008 4Q Pacing & FY Forecast Scenario," was circulated shortly after the meeting concluded. The report set forth Merrill's November losses at more than $4.9 billion – or more than $1 billion per week – and stated that Merrill's total fourth quarter losses would exceed $14 billion, or approximately $9 billion after taxes.

192.   As these officers knew, however, even that report materially understated Merrill's losses. As the first page of the revised 2008 4Q Pacing & FY Forecast Scenario report emphasized, it did not include any "goodwill writeoff," even though BOA's senior officers,

including Lewis and Price, knew that Merrill had decided in November to take a $2.2 billion goodwill write-off.  With the write-off included, Merrill's expected fourth quarter losses were now more than *$16.2 billion* dollars on a pre-tax basis, and more than $10.5 billion on an after-tax basis – exceeding even the unsupported range that BOA had set for disclosure of Merrill's losses on November 20, 2008.  Moreover, BOA's and Merrill's most senior officers now knew, two days before the shareholder vote, that Merrill's pre-tax losses for October and November alone would be at least $15 billion, and that the fourth quarter of 2008 was already by far the worst quarter in Merrill's history.[13]

193.  It has been alleged that after receiving this revised loss report on December 3, 2008, defendant Price met with Mayopoulos concerning an unrelated litigation.  At the end of that meeting, Price casually mentioned to Mayopoulos that "there had been revisions to the $5 billion after-tax forecast for Merrill Lynch's fourth quarter results."  Although defendant Price knew that Merrill's revised fourth quarter losses were now more than $10.5 billion after taxes and had exceeded even BOA's threshold for disclosure, defendant Price misled Mayopoulos into believing that Merrill's losses were billions of dollars less.  Specifically, according to Mayopoulos's sworn testimony before the New York Attorney General, the SEC, and Congress, Price informed Mayopoulos that Merrill's losses were only "$7 billion after taxes."  Based on the false and incomplete information provided to him by defendant Price, Mayopoulos again concluded, without performing any legal analysis or consulting outside counsel, that no disclosure needed to be made to shareholders voting on the transaction on December 5, 2008.

194.  When Mayopoulos learned days after the shareholder vote that Merrill's expected fourth quarter losses were materially higher than Price had informed him and sought to confront

---

[13]    Merrill could not borrow its way out of this trouble for myriad reasons, not the least of which was that, by this time, worldwide credit was completely choked off.

defendant Price about this discrepancy, Mayopoulos was immediately terminated without explanation, and escorted from BOA's premises.

195.    At the same time that Merrill was collapsing, BOA's own financial condition was materially deteriorating to the point where, as defendant Lewis acknowledged when he sought the taxpayer bailout, BOA would be unable to absorb the losses suffered by Merrill.  It has been alleged that as set forth in an internal Federal Reserve memorandum titled "Analysis of Bank of America & Merrill Lynch Merger" (the "Federal Reserve Merger Analysis"), before the Merger, BOA had incurred a loss of almost $800 million, and was projecting a total fourth quarter loss of $1.4 billion; the first quarterly loss in BOA's history.  In a December 19, 2008 email, Tim Clark, a Senior Advisor at the Fed, highlighted BOA's own financial deterioration, writing that, "[a]s they [BOA senior executives] themselves noted the other night at our meeting, even on a standalone basis, the firm is very thinly capitalized," BOA had used "quite optimistic underlying assumptions for the economy and performance of assets," and was "clearly not [] well prepared for any further deterioration."

### 9.    While Merrill Deteriorates, The Billions In Merrill Bonuses Are Finalized

196.    While the financial condition of Merrill deteriorated, executives at both companies found the time to finalize the billions of dollars of bonuses that they had agreed would be paid in December 2008 to Merrill executives and employees.  According to Thain's deposition testimony, in early November 2008, he and BOA's Chief Administrative Officer, Steele Alphin ("Alphin"), jointly determined and approved the size and composition of the final bonus pool, which was $3.6 billion.  On November 11, 2008, Thain presented the final bonus numbers and accelerated payment schedule to Merrill's Compensation Committee for review. Merrill's Compensation Committee approved the accelerated schedule as follows: final approval

of the bonuses would occur on December 8, 2008, one business day after the shareholder vote; employees would be informed of their bonuses on December 22, 2008; and employees would receive their cash awards by December 31, 2008.  On November 12, 2008, Thain informed Alphin of the precise dates involved in the accelerated schedule.

197.    Throughout this process, BOA's senior executives knew of the size and timing of the bonus payments.  As Thain stated to PBS *Frontline*: "[T]here was complete transparency with them starting from September when they agreed to the bonuses, all through the period of time until they were ultimately paid."

### 10.    Defendants Caused The Company To Issue The Materially False And Misleading Proxy

198.    Notwithstanding the allegedly heated internal disclosures debate, the Proxy failed to disclose any of the Merrill loss information that BOA had learned (described above) since the Merger was announced agreed; nor did the final Proxy adequately disclose BOA's burgeoning losses, and thus, BOA shareholders were effectively denied their franchise in the most important vote BOA ever conducted.  The Proxy also omitted the material fact that the Merrill bonuses would be paid *before* the Merger closed.  Worse still, BOA shareholders were denied this material information not for any high-minded reason, or because of some conjured smoke-and-mirrors legal opinion, it was simple greed; Defendants simply could not say or do anything that would have harmed their chances of consummating the Merger.  Defendants knew perfectly well that a negative vote was the likely result had they told the truth; that Merrill was a time bomb.  The Proxy also affirmatively misrepresented that Merrill would not make any discretionary bonus payments before the Merger closed on January 1, 2009.  Indeed, the Proxy identified discretionary compensation as an "extraordinary action," and assured investors that "Merrill Lynch will not" pay any compensation that was "not required."  In addition, the Merger

Agreement repeated the assurances as to discretionary compensation originally set forth in the September 18, 2008 Forms 8-K. Moreover, by incorporating Merrill's prior SEC filings, including the Merrill Proxy, the Proxy falsely assured investors that Merrill's "annual incentive compensation (annual bonus)" for executive officers is "paid in January for performance in the prior fiscal year," and "provide[s] an integral link between pay and performance."

199. Section 14(a) of the Exchange and Rule 14a-9 required Defendants to disclose all material facts to allow BOA shareholders to make an informed decision on the Merger, and to disclose any "material fact . . . necessary to correct any statement in any earlier communication" that was false or misleading or had "become false or misleading" due to intervening events. Defendants clearly violated Section 14(a), in fact, they have admitted as much in some of their *ex post* statements.

200. Significantly, in the weeks after the Proxy was mailed to shareholders, Defendants caused BOA and Merrill to issue updated the Proxy on at least two occasions, without disclosing any material facts concerning the losses at Merrill or BOA, or the accelerated bonus payments. Specifically, on November 21, 2008, Defendants caused BOA to file a Form 8-K, updating the Proxy to disclose that it had settled certain derivative litigation relating to the Merger and, as a condition of the settlement, had agreed to make certain disclosures in the Form 8-K related to the background of the Merger – without disclosing any information concerning Merrill's losses, the secret bonus agreement, or BOA's own deteriorating financial condition. Merrill filed an identical Form 8-K.

201. Then, on November 26, 2008, with the vote less than ten days away, Defendants caused BOA to again supplement the Proxy with the stated purpose of bolstering BOA's stock price, by filing a letter from defendant Lewis to shareholders pursuant to Rule 14a-6(b) that

assured shareholders that BOA's financial condition remained extremely strong despite the upheaval in the market. This was a critical misrepresentation, particularly considering its timing; worldwide stock markets had not been this exposed to a system-wide failure since 1929.[14] In that letter, which was written specifically to address investors' "deep concerns about . . . whether financial institutions have enough capital," Lewis represented that BOA was "one of the strongest and most stable major banks in the world," as well as "one of the most liquid banks in the world."  Once again, Lewis failed to disclose any of the materially adverse undisclosed information set forth above, including either the secret bonus agreement or Merrill's staggering losses.

202.    On December 5, 2008, BOA shareholders convened in Charlotte, North Carolina to vote on the Merger, while Merrill shareholders convened in New York.  BOA and Merrill shareholders voted in favor of the Merger.  Lewis represented that the Merger was the crowning event in BOA's corporate history, noting that, "it puts us in a completely different league." Lewis was probably not referring to one of the greatest destructions of wealth in the history of publicly-traded corporations, but, combined with the CW Acquisition, that is what it was, and/or what it has become.

11.    **Almost Immediately After Shareholders Approve The Merger, Mayopoulos Learns That Merrill's Pre-Vote Losses Are Materially Higher Than What He Had Been Told, Seeks To Confront Price About That Discrepancy, And Is Immediately Fired**

203.    On Tuesday, December 9, 2008, the second business day following the shareholder vote, defendants Lewis and Price met with the Board to discuss Merrill's

---

[14]    Many economists were stating so at this time, and continue to opine that, but for the federal government's late 2008/early 2009 stabilization efforts, the world's entire financial system may have collapsed. And this exposure stemmed from the increasing-esoteric, exotic, and deliberately opaque debt-based financial instruments that were created by the "Wizards of Wall Street," including some of the Defendants named herein.

deteriorating financial condition.  At the meeting, defendant Price presented to the Board the $14 billion pre-tax loss figure ($9 billion after-tax) that Price, Lewis, Thain, and Cotty discussed on December 3, 2008, which still failed to include the $2.2 billion goodwill write-down. At that meeting, defendant Price acknowledged that Merrill's massive fourth quarter losses were material to investors, stating that the "magnitude" of the losses was "quite significant."

204.    Mayopoulos, who attended the December 9, 2008 Board meeting, testified that he was "surprised" by the size of the loss, as he had been told by defendant Price on December 3, 2008 that Merrill's losses were only $7 billion.  As a result, after this meeting, Mayopoulos sought to confront Price about the fact that Merrill's pre-vote losses were materially greater than Price had represented to him.  According to Mayopoulos, he "want[ed] to talk to him [Price] about what's changed; why it's changed; what does it mean with respect to whether we should make a disclosure or not."  However, Mayopoulos was told that Price was unavailable for the rest of the day.  Mayopoulos decided to meet with Price the next day.

205.    The next morning – before Mayopoulos could speak to Price – Mayopoulos, who had served as BOA's General Counsel for five years, and who had been told by defendant Lewis on September 14, 2008 that he would be the General Counsel of the combined company, was summarily terminated without explanation, instructed to leave his personal effects behind, and immediately escorted from BOA's headquarters.  Mayopoulos was replaced as General Counsel by defendant Moynihan, who had not practiced law in 15 years, did not have an active license to practice law, and was promoted to another executive position within weeks of replacing Mayopoulos.

206.    Mayopoulos later testified to Congress:

I was stunned. I had never been fired from any job, and I had never heard of the general counsel of a major company being summarily dismissed for no apparent reason and with no explanation.

*     *     *

I could not understand why I was dismissed so abruptly. I was surprised that I was given no opportunity to say goodbye to my colleagues and staff, and why there was no orderly transition of my work to Mr. Moynihan. No one, including Mr. Moynihan, ever contacted me to discuss what I had been working on. Nearly a year later, I still do not know why I was terminated, who was involved in the decision to do so, or what their reasons or motivations were.

### 12.    Lewis Secretly Decides To Invoke The MAC And Terminate The Deal, But Agrees To Consummate The Transaction After Federal Regulators Threaten To Fire Him

207.    On December 12, 2008, one week after BOA shareholders voted to approve the Merger, defendants Lewis and Price received a report showing that Merrill would report a pre-tax loss for the quarter of at least $18 billion.  As a result, according to a February 5, 2009 *Wall Street Journal* article, defendant "Lewis told Bank of America directors in a conference call that the bank might abandon the acquisition, which was supposed to close in two weeks."

208.    Thereafter, on the morning of December 17, 2008, Lewis called Secretary Paulson and told him that BOA had concluded that it had grounds to invoke the MAC and was "strongly considering" doing so, according to Lewis's deposition testimony.   Secretary Paulson immediately ordered Lewis to fly up to Washington, D.C. for a meeting that evening at 6 p.m. at the Fed.

209.    On the evening of December 17, 2008, defendants Lewis and Price met with Secretary Paulson, Chairman Bernanke, Federal Reserve General Counsel Scott Alvarez ("Alvarez"), and other Treasury and Federal Reserve officials.  Lewis began the discussion by reporting the dire financial condition of the combined company.  Lewis stated that BOA was projected to lose $1.4 billion in the fourth quarter, the Company's first quarterly loss in its history.  Lewis then reported that Merrill's massive fourth quarter losses were so large that they would materially impact BOA's tangible common equity and Tier 1 capital ratios.  Defendant

Price's handwritten notes from the meeting, released by Congress, show that Lewis told the regulators that Merrill had recently suffered "unusual" losses and was now projecting losses for the quarter of approximately $18 billion on a pretax basis, which amounted to a $12.5 billion net loss after taxes. Defendant Lewis stated that BOA had concluded that a material adverse change had occurred in Merrill's financial condition, and that it would terminate the Merger pursuant to the MAC. In an effort to explain his failure to disclose these losses earlier, Lewis falsely claimed that he only learned of Merrill's losses in mid-December, when they supposedly suddenly accelerated.

210.   Chairman Bernanke and Secretary Paulson both urged Lewis not to invoke the MAC, opining that such an action would have serious repercussions for BOA and Merrill. In response, Lewis raised the idea of BOA receiving a taxpayer bailout – including a "Citi-type" guarantee on $50 billion of assets – to proceed with the transaction, according to Price's handwritten notes. Secretary Paulson asked for time to allow the Treasury and Fed to analyze the situation. Lewis agreed to supply the Fed with information on Merrill's and BOA's fourth quarter performance and risk exposures, and to wait to hear back from the regulators before taking further action. Following this meeting, Lewis provided the regulators with the current and prior loss forecasts that BOA executives had been receiving throughout the fourth quarter.

211.   After reviewing Merrill's internal data, senior Fed officials expressed their disbelief regarding Lewis's claims that he was recently surprised by the size of Merrill's losses. As Kevin Warsh, a member of the Board of Governors of the Federal Reserve, flatly stated in one email: "This claim is not credible." On December 19, 2008, Tim Clark, a Senior Advisor in the Fed's Division of Banking Supervision and Regulation, emailed other Fed officials that Merrill's losses were clear from the beginning of the fourth quarter, and that any claim of

"surprise[]" was dubious:

> General consensus forming among many of us working on this is that given
> market performance over past several months and the clear signs in the data we
> have that the deterioration at [Merrill] has been observably under way over the
> entire quarter – albeit picking up significant[ly] around mid-November and
> carrying into December – Ken Lewis' claim that they were surprised by the rapid
> growth of the losses seems somewhat suspect.

212.    Senior Fed officials repeated this conclusion in the "Federal Reserve Merger

Analysis," which stated:

> While the extent of the market disruptions that have occurred since mid-
> September were not necessarily predictable, [BOA] management's contention that
> the severity of [Merrill's] losses only came to light in recent days is problematic
> and implies substantial deficiencies in the due diligence carried out in advance of
> and subsequent to the acquisition.

213.    According to the Federal Reserve Merger Analysis, BOA should not have been

surprised by Merrill's losses because Merrill's largest risk exposures were well known to BOA.

As that analysis stated, the "single largest area of risk exposure and driver of recent losses that

have been identified by management" was Merrill's "large losses stemming from exposures to

financial guarantors."  These exposures and losses, Fed officials concluded, "were clearly shown

in Merrill Lynch's internal risk management reports that [BOA] reviewed during their due

diligence."  In addition, Fed officials concluded that the balance of Merrill's "risk exposures

cited by management . . . should also have been reasonably well understood, particularly as

[BOA] itself is also active in [] these products."

214.    The Federal Reserve Merger Analysis highlighted the "problematic" nature of

Lewis's claim of surprise given the fact that the Proxy "explicitly assert[ed] that [BOA] has an

understanding of [Merrill's] business activities, financial condition and prospects as well as an

understanding of the outlook for the firm based on prospective economic and market conditions."

215.    As noted above, evidence emerging as a result of federal and state investigations

of the Merger has confirmed that Defendants were aware of the losses at Merrill much earlier than mid-December 2008. Among other things, before the shareholder vote, Defendants: (i) were fully aware that Merrill would report a loss for the fourth quarter of at least $16.2 billion; (ii) were so concerned with the magnitude of these losses that they discussed invoking the MAC or otherwise disclosing them to shareholders; and (iii) were found not to be credible by senior government officials when they claimed that Merrill's losses and goodwill write-downs were "surprising," and had not materialized until after the shareholder vote.

216.   On December 19, 2008, defendants Lewis and Price again spoke with Secretary Paulson, Chairman Bernanke, and other Treasury and Fed officials. It has been alleged, according to defendant Price's handwritten notes of the meeting, Lewis reported that Merrill was now projected to have fourth quarter losses in excess of $21 billion pre-tax, and that BOA would likely invoke the MAC. The additional losses consisted principally of the $2.2 billion goodwill charge that BOA's senior management had been aware of since mid-November. Secretary Paulson asked Lewis what needed to be done to have the deal proceed. Lewis raised two possibilities: the government could purchase Merrill's toxic assets directly, or provide an asset guarantee to BOA.

217.   Defendant Price's handwritten notes show that Fed officials unequivocally told Lewis that a decision by BOA to invoke the MAC would reveal that BOA's prior statements about the benefits of the Merger were false, and would cause the market to seriously question BOA's financial condition and the judgment of its management. Chairman Bernanke testified before Congress that he told Lewis that "an attempt [by BOA] to invoke the MAC after three months of review, preparation and public remarks by the management of Bank of America about the benefits of the acquisition would cast doubt in the minds of financial market participants,

including the investors, creditors and customers of Bank of America about the due diligence and analysis done by the company, its capacity to consummate significant acquisitions, its overall risk management processes and the judgment of its management." In other words, had Lewis and the other Defendants done what their own counsel urged them to do -- disclosed Merril's massive losses and BOA's deteriorating condition prior to the Merger vote, *i.e.*, comply with their fiduciary duties – Defendants would not be boxed-in now.

218. On December 21, 2008, defendant Lewis called Secretary Paulson on his cell phone, reaching him at a ski cabin in Colorado, to discuss the situation further. Secretary Paulson bluntly told Lewis that the Fed would remove BOA's senior management if it tried to terminate the transaction. According to Secretary Paulson's testimony before Congress:

> It was . . . appropriate for me to remind him under such circumstances [that] the Federal Reserve could invoke its authority to remove management and the board of Bank of America. I intended my message to reinforce the strong view that had been expressed by the Fed and which was shared by the Treasury that it would be unthinkable that Bank of America take this destructive action.

219. The threat to fire Lewis had its intended effect. Lewis testified in a deposition taken by the New York Attorney General's office that, before receiving this threat, "we [BOA] were going to call the MAC." After receiving this threat, Lewis reversed course. As the New York Attorney General wrote to Congress in a letter dated April 23, 2009, its investigation established that:

> Secretary Paulson's threat swayed Lewis. According to Secretary Paulson, after he stated that the management and the Board could be removed, Lewis replied, "that makes it simple. Let's deescalate." Lewis admits that Secretary Paulson's threat changed his mind about invoking that MAC clause and terminating the deal.

220. That day, defendant Lewis told Secretary Paulson and Chairman Bernanke separately that BOA would proceed with the Merger and would work with federal regulators on designing a bailout package. Lewis made the decision to proceed with the Merger even though

he knew that the impact of Merrill's losses would harm BOA shareholders.  Essentially, Lewis sought to preserve his position (and that of the other Defendants) at the expense of the Company and its stockholders.   Critically, Paulson's threat was only viable because Defendants had breached their fiduciary duties to that point: had Defendants issued truthful, timely disclosures, Paulson and the federal government would not have been able to hold a Damoclean sword over his/its head, the threat of liability based on Defendants omissions was enough for Defendants to cave.  Specifically, at his deposition, Lewis was asked whether BOA's shareholders were being forced to take "the hit of the Merrill losses," and if this "hit" would harm them.  He responded that BOA's investors were harmed over the "short term," which he defined as "[t]wo to three years."  As alleged herein, Lewis's estimate has proven dramatically optimistic, as BOA is still suffering mightily today as reflected by almost any metric, especially, its stock price, which is trading at around the same level as its crisis-era prices (*i.e.*, right after defendant Lewis revealed all of the problems with Merrill).  Accordingly, defendant Lewis's "two to three years" estimate has proven overly optimistic as there are few signs that BOA's operating condition or stock price will materially improve anytime soon.

221.   This too was an opportunity for a strong board to protect its charges, but the Board here failed stockholders miserably, and as the paragraph above illustrates, shareholders are still paying the pirce for Lewis' folly, and the Board's multiple failures to even attempt to satisfy their fiduciary duties.

222.   Recognizing that his conduct would likely result in legal liability for misleading shareholders, defendant Lewis next took the extraordinary step of trying to obtain protection from the government against shareholder suits.  It has been alleged that according to a December 22, 2008 email from Chairman Bernanke to the Federal Reserve's General Counsel Alvarez,

Lewis had just "confirm[ed] his willingness to drop the MAC," but "he fears lawsuits from shareholders for NOT invoking the MAC, given the deterioration at [Merrill]." Thus, defendant Lewis had asked Bernanke "whether he could use as a defense that the [Government] ordered him to proceed for systemic reasons." Bernanke told Lewis "no," so Lewis and the rest of the Defendants will not be able to invoke the "Hank Paulson made me do it defense" in this case.

223.   Chairman Bernanke then asked Alvarez whether the Fed supervisors could formally advise Lewis that invoking the MAC was not in the best interests of BOA, and whether Lewis could use such a letter as a defense from suit. Alvarez responded that such a letter was not "appropriate." Alvarez also underscored that Lewis faced liability for BOA's lack of disclosures to shareholders in advance of the shareholder vote. Alvarez wrote:

> Management may be exposed if it doesn't properly disclose information that is material to investors. There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial reports. . . . *His potential liability here will be whether he knew (or reasonably should have known) the magnitude of the [Merrill] losses when [BOA] made its disclosures to get the shareholder vote on the [Merrill] deal in early December.*

224.   In a follow-up email to Bernanke on this subject, Alvarez specifically noted that Fed officials' conclusions about Lewis's knowledge of Merrill's losses before the shareholder vote caused "problems" for Lewis under the securities laws:

> [O]nce we're in the litigation, all our documents become subject to discovery and, as you'll remember from Deborah's presentation, some of our analysis suggests that Lewis should have been aware of the problems at [Merrill] earlier (perhaps as early as mid-November) and not caught by surprise. That could cause other problems for him around the disclosures [BOA] made for the shareholder vote.

## 13.   With BOA Unable To Absorb Merrill's Losses, Lewis Secretly Seeks And Receives An Enormous Taxpayer Bailout

225.   Ultimately, in order to proceed with the Merger, to satisfy his vanity, defendant Lewis requested and obtained a *$138 billion* taxpayer bailout, consisting of a $20 billion capital infusion in exchange for a sale of preferred stock, which diluted the ownership interests of other

BOA shareholders, and a guarantee against losses on $118 billion of high-risk assets, the large majority of which came from Merrill. In a Board meeting on December 22, 2008, defendants Lewis and Price told the Board that government officials had agreed to this bailout package. According to the meeting minutes, Lewis informed the Board that "the Treasury and Fed have confirmed that they will provide assistance to the Corporation to restore capital and to protect the Corporation against the adverse impact of certain Merrill Lynch assets"; that "the Corporation can rely on the Fed and Treasury to complete and deliver the promised support by January 20, 2009, the date scheduled for the release of earnings by the Corporation"; and that Chairman Bernanke had "confirmed that the [Office of the Comptroller of the Currency], FDIC, the current and incoming Treasury officials, and the incoming economic team of the new administration are informed of the commitment to the Corporation by the Fed and Treasury and that all concur with the commitment of the combined federal regulators ('federal regulators') to the Corporation."

226. Lewis also made clear that management's recommendation to proceed with the Merger was based on, among other things, "the verbal commitment of the Fed and Treasury to have a transaction evidencing the Fed's and Treasury's committed assistance in existence no later than January 20, 2009" and "the assurances which have been made by the Fed and Treasury and clarification that funds under the TARP program are available for distribution to the Corporation to fulfill the commitment of the Treasury and Fed."

227. After defendant Lewis informed the Board that the federal government had "confirmed that they will provide assistance to the Corporation," defendant Lewis deliberated over "the importance of the timing of the announcement of the commitment of the Fed and Treasury." Recognizing the material risk that BOA would be severely downgraded by credit rating agencies and that shareholders would demand that the Merger be terminated if BOA

disclosed the government bailout before the Merger closed – and knowing that, if the Merger failed, he would be fired – defendant Lewis made the conscious decision not to disclose the bailout until after the Merger closed.   Specifically, when defendant Lewis learned that the government would have to disclose that it was providing funding to BOA if the government's commitment was reduced to writing, Lewis immediately advised the Board that the Company would not enter into a written agreement because it could not complete the Merger if this information was disclosed in advance of the Merger's close.  On December 22, 2008, Lewis sent the following email to the Board with the subject "Privileged and Confidential to Board of Directors," evidencing his desire to conceal this information until after the Merger was complete:

> I just talked with Hank Paulson. He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure which, of course, we do not want.

228.   On December 30, 2008, defendants Lewis and Price met with the Board to update them concerning the U.S. Government's commitment, and further underscored that the deal with the U.S. Government was firm and detailed.  It has been alleged that according to the minutes of this meeting, "management has obtained detailed oral assurances from the federal regulators with regard to their commitment and has documented those assurances with e-mails and detailed notes of management's conversations with the federal regulators."   Lewis "discussed in detail several of the conversations between Mr. Price and Mr. Warsh establishing essential elements of the commitment of the federal regulators including . . . the commitment of the federal regulators to deliver assistance in the form of capital and asset protection to the Corporation."  Price "reported that he had confirmed to Mr. Bernanke and Mr. Paulson the reliance of the Board and management on the federal regulators' assurances."  Lewis added that:

> management of the Corporation had clearly explained to the federal regulators the terms and conditions required by the Corporation to consummate the acquisition of Merrill Lynch on January 1, 2009. In return, he reported, management has received strong assurances from all relevant federal regulators and policy makers

that the Corporation will receive adequate and appropriate assets to neutralize the impact to the financial condition of the Corporation resulting from the Corporation's acquisition of Merrill Lynch on January 1, 2009.

229.   Despite this detailed commitment for a massive taxpayer bailout designed to "neutralize the impact . . . resulting from the Corporation's acquisition of Merrill Lynch," defendant Lewis again determined to withhold this information from BOA shareholders and investors.   Clearly, Lewis should not have been running a public company during a crisis. According to the minutes of the Board's December 30, 2008 meeting: "Mr. Lewis explained that written assurances would not be received before January 1, 2009" – the date the Merger was scheduled to close – precisely "because any written assurances would require formal action by the Fed and Treasury, which formal action would require public disclosure."   Notes from that meeting reflect that Lewis told the Board that BOA could not disclose the bailout, because it would "disrupt" the close of the Merger.   According to these notes, BOA was "Treating [the agreement] very close – Don't want leak."

230.   The Board is directly implicated in this incredible breach of duty; rather than disclose information about the Government bailout at that time, Defendants determined to announce it "in conjunction with [BOA's] earning release on January 20, 2009," weeks after the Merger was set to close.

### 14.   Internal BOA Emails Establish That, At The Same Time Defendants Decided To Hide The Bailout Prior To The Merger's Close, They Internally Acknowledged That The Market Was Being Misled As To Merrill's True Financial Condition

231.   Significantly, at the same time defendants Lewis and Price were obtaining the taxpayer bailout, Defendants and BOA's counsel were acknowledging internally that the failure to disclose the bailout and Merrill's losses was affirmatively misleading the market, which had "no inkling" that Merrill had suffered such devastating losses.   These same emails make clear

that Defendants knew that disclosure of this information would cause the deal to "fall apart," and

"confirm [the] materiality of the fourth quarter losses."

232.    On December 17, 2008, the same day that defendant Lewis approached the

government for the bailout, Jeff Brown ("Brown"), BOA's Treasurer, sent defendant Price an

email regarding a conversation he had had with Standard & Poor's ("S&P").  Brown made clear

that he was "concerned" that S&P had no idea of Merrill's true financial condition:

> What concerns me is that they are not expecting poor results from ML this quarter
> and he [S&P] said the ratings committee noted substantial improvements in ML
> risk/balance sheet management.
>
> *                *                *
>
> *But in light of ML's 4Q performance that we know relative to what they know ....*
> This could be an issue and result in another downgrade. This is just my view, but
> *they clearly think ML is more healthy than they are and that they have shed the*
> *worst risks.*

233.    Brown further noted in that email that S&P believed that BOA was in

significantly better shape than its competitors because, unlike them, BOA did not need

government assistance:

> They are also moving to a new approach to assess relative ratings in this
> environment. Basically all this means is that there are different rankings within a
> particular rating – ie) we are A+; another institution may have the same headline
> but be worse-off on a relative basis since they may need government programs to
> survive. The view of S&P is that we do not need government assistance ... ie) we
> are now A+ regardless. He noted that previously 5 institutions on a global basis
> were rated at the same or higher than BAC. Now there are only 3 intuitions [sic]
> that would be considered higher and 2 of those were domestic (I presume WFC
> and JPM).

234.    Similarly, on December 17, 2008, Brown received an email from a member of

BOA's Corporate Treasury Department regarding a conversation she had had with Moody's

Corporation ("Moody's").  According to that email, Moody's had stated in this meeting that "you

guys [BOA] are getting a great deal on this acquisition.  We think very highly of the Merrill

franchise."  The email concluded with the sarcastic comment, "So, we have that going for us."

As evidenced by those communications with two of three biggest credit ratings agencies, the market had no idea that BOA was acquiring a time bomb for $29 per share which valued Merrill at *$50 billion*.

235.    Despite the fact that Brown had again expressed his "concerns" that the market was being misled, defendant Price took no action.  Thus, two days later, on December 19, 2008, Brown forwarded the email he had received on December 17 directly to in-house disclosure counsel at BOA.  Brown wrote the following on that email:

> Moody's comment on the deal – again another sign agencies don't know what is coming.

236.    In-house counsel immediately forwarded Brown's email to Wachtell.  Wachtell then spoke to both Brown and BOA's in-house counsel.  It has been alleged that according to notes of that December 19, 2008 discussion that were taken by Wachtell senior partner Peter Hein, the parties agreed that the failure to disclose Merrill's massive losses had resulted in a "fundamental issue of lack of credibility" with the market.  Significantly, the parties also agreed that, if those losses were disclosed prior to the Merger close, it would cause rating agency downgrades, resulting in the deal falling apart, and confirming the materiality of Merrill's undisclosed losses:

> Fundamental issue of lack of credibility with rating agencies to whom Target may not have disclosed the ever increasing losses for the fourth quarter; if Target now belatedly makes that disclosure, likely to have adverse impact on perception of rating agencies (who do not have an inkling this is coming); such a rating agency reaction would, if such reaction occurred after deal fell apart, presumably confirm materiality of the fourth quarter losses[.]

237.    These emails show that, at the time that Defendants decided not to disclose the taxpayer bailout and Merrill's losses, they knew that: (i) this information was highly material; (ii) the market had no idea that Merrill had suffered such massive losses in the fourth quarter; (iii) disclosure of these material facts before the Merger closed would inevitably cause rating

agency downgrades and result in the deal falling apart; and (iv) the market was being misled by the failure to disclose these facts.  Indeed, on December 22, 2008, only five days after Brown informed defendant Price that BOA's ratings depended on keeping the rating agencies in the dark about Merrill's losses and the need for the bailout, defendant Lewis told that BOA Board that "of course, we do not want" public disclosure of these facts, and it conspired with Lewis to sell this pig-in-a-poke to BOA shareholders, and indirectly, every single person that pays federal taxes in this country.

### 15. The Merger Is Consummated While Defendants Lewis And Price Continue To Conceal Merrill's $21 Billion Of Losses, The $3.6 Billion In Bonuses Paid To Merrill Executives And Employees, And The Taxpayer Bailout

238.    By December 31, 2008, Merrill had suffered more than $21 billion in losses for the fourth quarter, a sum greater than the Merger purchase price.  On that day – its last as an independent company – it paid out the cash component of $3.6 billion in bonuses to its employees and executives, further eroding its value to BOA shareholders.  Obviously, the Merrill executives deserved these bonuses because of the brilliant job they did destroying Merrill.

239.    On January 1, 2009, Defendants caused BOA to close its purchase of Merrill without ever disclosing that (i) Merrill had suffered fourth quarter losses of more than $21 billion before taxes; (ii) BOA had suffered its own fourth quarter net loss of $1.8 billion after taxes; and (iii) the combined company was so devastated that it required a $138 billion taxpayer bailout to save it from collapse.

240.    Based on Defendants' representations to the market as of that date, analysts had previously estimated that BOA would independently report earnings of $0.08 per share for the fourth quarter of 2008.  A January 10, 2009 internal Fed memo entitled "Considerations regarding invoking the systemic risk exception for Bank of America Corporation" underscored

the fact that Defendants' recent statements had misled investors into believing that the combined company was financially healthy.   Specifically, the memo stated: "The earnings guidance provided by the firm to the investor community does not infer that 4Q performance at either organization will be as negative as we have been told. Further, a survey of equity analysts suggests that the investor community have significantly more positive expectations regarding fourth quarter performance."

**16.**     **The Truth Finally Emerges Regarding The Merrill Acquisition**

241.     News that Merrill and BOA would report much higher losses than expected began to leak into the market by no later than Sunday, January 11, 2009, when a BOA analyst forecast fourth quarter losses at Merrill to be $6 billion, including $7 billion in write-downs on Merrill's "high risk assets," and further wrote that BOA might post a $3.6 billion fourth-quarter loss and slash its quarterly dividend from $0.32 to $0.05 per share.  In response, shares of BOA stock fell from $12.99 at the close of the market on the prior trading day to $11.43 on Monday, January 12, 2009 – a 12% drop.

242.     According to a June 1, 2009 article in the *Sydney Morning Herald*, on January 14, 2009 in Sydney (which was January 13 in New York), Merrill executives in Australia had informed Australian bond traders that Merrill was going to report "awful" news that was going to cause the market to "plummet" on January 15, 2009.  One trader reported that he was told that "[t]he market is expecting Merrill Lynch in New York to come out with a bad result on Thursday night," and that the news would "start to leak out."  BOA shares dropped from a close of $11.43 on January 12, 2009, to a close of $10.65 on January 13, 2009 on heavy volume.

243.     On the morning of January 15, 2009, *The Wall Street Journal* reported that "[t]he U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of

America Corp. to help it close its acquisition of Merrill Lynch & Co.," citing larger-than-expected but unquantified fourth quarter losses at Merrill. In response, Defendants caused BOA to announce that it was moving its fourth quarter and full-year 2008 earnings call to January 16, 2009, four days earlier than planned. The price of BOA stock fell from $10.20 per share on January 14, 2009 to close at $8.32 per share on January 15, 2009 – an 18% drop which left BOA's share price at an 18-year low.

244.    During a meeting of the Board on January 15, 2009, defendant Gifford (a director on the Board) sent an email to defendant May stating "it's screw the shareholders!!" This would prove to be both an understatement and yet another omission: things would get (and remain) worse for shareholders, and Gifford should have added "U.S. taxpayers."

245.    On the morning of January 16, 2009, the Treasury Department issued a press release disclosing the government bailout of BOA. Later that morning, *The Wall Street Journal* published an article entitled "Crisis on Wall Street – Bank Stress: BOA's Latest Hit – Treasury to Inject $20 Billion More: Stock at 1991 Level," in which it speculated that Merrill's losses "could total in excess of $10 billion," and further reported that:

> Reeling from previously undisclosed losses from its Merrill Lynch & Co. acquisition, Bank of America Corp. is expected to receive an emergency capital injection of $20 billion from the Treasury, which will also backstop as much as $120 billion of assets at the bank, said people familiar with the plan. Reports of the unexpected Merrill losses sent Bank of America shares to their lowest levels since 1991 . . . . *Thursday's 18% stock-market drop gives the Charlotte, N.C. bank a market value of $41.8 billion, a sum below the $46 billion in shares it originally offered for Merrill.* Its shares have lost over 40% of their value in the past seven trading sessions. The developments angered some Bank of America shareholders, who began to question why Chief Executive Kenneth Lewis didn't discover the problems prior to the Sept. 15 deal announcement. Many also wanted to know why he didn't disclose the losses prior to their vote on the Merrill deal on Dec. 5, or before closing the deal on Jan. 1.

246.    Later that morning, Defendants caused BOA to disclose that: (i) Merrill had suffered a fourth quarter after-tax net loss of $15.31 billion, or more than $21 billion before

taxes, which accounted for more than 55% of Merrill's full year after-tax loss of $27 billion; (ii) BOA had suffered its own net loss of $1.8 billion in the fourth quarter; and (iii) the U.S. Government was injecting $20 billion of capital into the Company in exchange for preferred stock, and had agreed to provide protection against further losses on $118 billion of risky assets, primarily from Merrill, for which the U.S. Government would charge a fee of $4 billion in the form of additional preferred stock. *With the fourth quarter losses, Merrill had lost a staggering $27 billion for the year*, or ($24.44) per share for the year, and ($9.62) per share for the quarter, diametrically opposed to the fourth quarter profit that the market was expecting for Merrill. Similarly, BOA's own losses meant that it had lost ($0.48) per diluted share, a far cry from the $0.08 per share profit that analysts expected.  In addition, Defendants caused the Company to announce that it was virtually eliminating its dividend, reducing it from $0.32 to $0.01 per share.

247.    The $24 billion of preferred shares that BOA was required to sell to the U.S. Government under the terms of the bailout carried an 8% dividend rate, which would require BOA to pay almost $2 billion per year in dividends to the Treasury Department, thus severely reducing shareholder returns, and diluting the value of BOA common stock by approximately thirty cents per share for 2009.  Further, BOA was required to pay the U.S. Government $236 million per year for the asset guarantee, as well as an unspecified fee when it desired to end the asset guarantee, all of which further reduced its future earnings and diluted the value of its common stock.  In addition, BOA's acceptance of this government funding, on top of the TARP funds it had previously received, qualified it as a recipient of "extraordinary" government aid, a status that was so unique that, apart from BOA, the only other "extraordinary" recipients were AIG and Citigroup.  This designation, in turn, subjected BOA to additional government oversight and restrictions.

248.     On the January 16, 2009 conference call to discuss these results, defendant Lewis admitted that BOA was unable to absorb Merrill's losses without the taxpayer bailout:

> We went to our regulators and told them that we would not – that we could not close the deal without their assistance. As a result, we have agreed to the issuance of $20 billion in Tier 1 qualifying TARP preferred, as well as the issuance of an additional preferred of $4 billion in exchange for an asset guarantee . . . .

249.     The market was astonished.  On January 16, Deutsche Bank reported that: "While core results [for Bank of America], esp. credit, are worse than expected, the main negative surprise relates to the Merrill Lynch deal in terms of losses and new [Government] involvement."

250.     As Lewis admitted on PBS *Frontline*, "The magnitude of the loss, obviously, at Merrill Lynch really stunned people. And so it was a bad day and it did shock a lot of people and disappoint a lot of people."  As alleged herein, as Lewis's carefully-edited statement indicated, while "people" were stunned (putting it mildly), he, and the remaining Defendants were not, and they hid this information for as long as they possibly could.

251.     After the close of markets on January 16, 2009, as defendant Price had been told would happen prior to the close of the Merger, Moody's downgraded BOA's credit ratings due to "the disclosure of substantial losses at Merrill Lynch," and Fitch downgraded Merrill's individual rating to "F" – well below junk status – due to its "massive losses" and its inability to "survive[] absent assistance provided by the U.S. Treasury."

252.     On Saturday, January 17, 2009, *The New York Times* published a lengthy article describing Merrill's massive losses as "devastating" and revealing that BOA's management had contemplated exercising the MAC after the vote but prior to the closing of the Merger, and was dissuaded by the government from doing so.  In addition, *The Wall Street Journal* reported that BOA's own weakened financial condition contributed to the need for Government aid.

253.    The next trading day, Tuesday, January 20, 2009 (following the weekend and the Martin Luther King, Jr. holiday), J.P. Morgan reported that BOA's fourth quarter losses were "enormous," adding:

> [BOA] announced a major agreement with the U.S. government that reflected primarily the poor acquisition of [Merrill] done without due diligence as well as some assets from its own weakening portfolio. [Merrill] over-represented its value given its large amount of high risk assets and the level of permanent dilution for [BOA] from the acquisition will likely be higher.

254.    In direct response to these disclosures, BOA shares fell from $8.32 per share, its opening price on January 16, 2009, to a closing price of $5.10 per share on January 20, 2009 – a drop of 38.7%.

255.    In only six trading days between January 12, 2009 and January 20, 2009, as investors learned the truth about this materially adverse information, BOA stock plummeted from $12.99 to $5.10 – a decline of 60% – causing a market capitalization loss of over $50 billion.  Even at this price, BOA common stock, Preferred Securities, and Debt Securities all remained artificially inflated because news of the massive, accelerated Merrill bonuses had yet to be disclosed; thus, even Defendants' purported "coming clean" disclosures suffered from material omissions.

256.    Then, on January 21, 2009, just before midnight, the *Financial Times* reported Merrill's accelerated bonus payments, stressing that Merrill had taken "the unusual step of accelerating bonus payments by a month last year."  Although the amount of the bonuses was not public, the *Financial Times* further reported that "a person familiar with the matter estimated that about $3bn to $4bn was paid out in bonuses in December," before the Merger closed.  According to the article, Nancy Bush, a bank analyst with NAB Research, described the bonuses as "ridiculous," especially in light of Merrill's losses.

257.    After the *Financial Times* broke the news of Merrill's bonus payments, on the

morning of January 22, 2009, defendant Lewis flew from Charlotte, North Carolina to New York City and fired Thain after only 22 days in his new job. According to Thain's PBS *Frontline* interview, the conversation took "two minutes," during which Lewis told Thain, "You are going to take the blame for the fourth quarter losses."

258.  On January 22, 2009, the *Associated Press* reported that the revelation of the accelerated bonus payments amidst Merrill's losses triggered Thain's purported "resignation," writing, "John Thain resigned under pressure from Bank of America on Thursday after reports he rushed out billions of dollars in bonuses to Merrill Lynch employees in his final days as CEO there, while the brokerage was suffering huge losses and just before Bank of America took it over."

259.  The financial press uniformly reported that the size and accelerated schedule of Merrill's bonus payments – as well as the fact that they were paid amidst historically large losses – was stunning news to the investor community and directly contributed to Thain's departure. For example, on January 23, 2009, *The Wall Street Journal* reported that Thain's firing took "less than 15 minutes" and was precipitated in part by "[v]itriol . . . over Merrill paying out bonuses much earlier than expected," which would have likely been "cut amid a much leaner plan at Bank of America" had they not been "accelerated." Similarly, the *Charlotte Observer* reported that "Thain's departure follows a raft of damaging revelations in recent days, including bigger- than-expected fourth-quarter losses at Merrill, executive defections and disclosure of 11th-hour bonus payments to Merrill employees before the deal closed."

260.  The *Los Angeles Times* reported on January 23, 2009 that it was "revealed Thursday that Merrill had moved up the payment of employee bonuses to days before the merger closed," and the *Associated Press* reported that "on Thursday came the news that [Lewis] didn't

block Merrill management's decision to dole out billions of dollars in early bonuses even as [Lewis] was pleading for more bailout cash from Washington to cover Merrill's ballooning losses."

261.   Even after the *Financial Times* report, Defendants caused BOA to refuse to disclose or confirm the size of the bonuses, as did Merrill.  As the *Charlotte Observer* reported on January 23, 2009, BOA still "wouldn't say how much Merrill paid in bonuses," and it was impossible to discern the size of the bonuses from the general compensation and benefits expense in Merrill's financial statements because "[t]hat number includes salaries, bonuses, benefits, retirement payments, commissions for financial advisors and severance for laid-off employees."

262.   The news of Merrill's bonus payments immediately triggered an investigation by the New York Attorney General.  On January 23, 2009, *The New York Times* reported that the New York Attorney General's office "is examining the payouts, which a person inside the office characterized . . . as 'large, secret last-minute bonuses.'" In a subsequent letter to Congress, the New York Attorney General underscored that:

> Merrill Lynch had never before awarded bonuses at such an early date and this timetable allowed Merrill to dole out huge bonuses ahead of their awful fourth quarter earnings announcement and before the planned takeover of Merrill by Bank of America.
>
> Merrill Lynch's decision to secretly and prematurely award approximately $3.6 billion in bonuses, and Bank of America's apparent complicity in it, raise serious and disturbing questions.

263.   In response to the disclosure of Merrill's enormous, accelerated bonus payments, BOA stock fell another 15% on heavy trading volume, dropping from a close of $6.68 per share on January 21, 2009 to a close of $5.71 per share on January 22, 2009.  All told, BOA common stock fell 56% – from $12.99 per share on January 9, 2009 to $5.71 per share on January 22, 2009 – in response to these belated disclosures, destroying tens of billions of dollars in

shareholder value.  Similarly, the price of BOA's Preferred Securities fell by over 30% in the aggregate, while the Debt Securities likewise fell by 6.4% in the aggregate during this same time period.

264.    The fallout from the revelations described above has been immense, resulting in additional civil and criminal investigations at both the federal and state levels.  In addition to the New York Attorney General's investigation, which resulted in the filing of a complaint on February 4, 2010 against BOA, Lewis, and Price charging them with securities fraud, a similar investigation was initiated by the Attorney General of North Carolina to determine whether, among other things, Merrill and BOA had violated that state's laws against fraudulent transfers and civil racketeering. Neil Barofsky, the TARP Inspector General, also opened a probe.

265.    Additionally, in January 2009, although it would not be disclosed to shareholders until mid-July 2009, the Fed and the Office of the Comptroller of the Currency downgraded the overall rating of BOA from "fair" to "satisfactory."  A letter sent by Fed officials explaining the action criticized BOA's management and directors for being "overly optimistic" about risk and capital.  As the letter explained, "Management has taken on significant risk, perhaps more than anticipated at the time the acquisition was proposed," and, as a result, "more than normal supervisory attention will be required for the foreseeable future."  As a result of these conclusions, in early May 2009, federal regulators imposed a "memorandum of understanding" on BOA that, among other things, required it to address its problems with liquidity and risk management.

266.    On February 10, 2009, the New York Attorney General wrote a letter to Congress providing details on Merrill's accelerated bonus payments.  The letter detailed how Merrill's accelerated bonus schedule had allowed it to disproportionately reward its top executives despite

its massive losses – actions which the New York Attorney General described as "nothing short of staggering." In particular, the New York Attorney General stated that:

> While more than 39 thousand Merrill employees received bonuses from the pool, the vast majority of these funds ***were disproportionately distributed to a small number of individuals. Indeed, Merrill chose to make millionaires out of a select group of 700 employees. Furthermore, as the statistics below make clear, Merrill Lynch awarded an even smaller group of top executives what can only be described as gigantic bonuses.***

267.    Among the statistics that the New York Attorney General set forth were that: (i) "[t]he top four bonus recipients received a combined $121 million"; (ii) "[t]he next four bonus recipients received a combined $62 million"; (iii) "[f]ourteen individuals received bonuses of $10 million or more and combined they received more than $250 million"; and (iv) "[o]verall, the top 149 bonus recipients received a combined $858 million."

268.    On April 29, 2009, at the Company's annual meeting, BOA shareholders voted to strip Lewis of his position as Chairman of the Board in a vote that analysts deemed a rebuke to Lewis's Merger conduct. *BusinessWeek* reported that the "vote marked the first time that a company in the Standard & Poor's 500-stock index had been forced by shareholders to strip a CEO of chairman duties." At the shareholder meeting, Lewis conceded that BOA's shareholders "have carried a heavy burden" as a result of the Merrill acquisition.

269.    On May 7, 2009, the U.S. Government revealed results of certain "stress tests" of large banks conducted by the Fed. BOA was deemed to need an additional $33.9 billion of Tier 1 common capital – far more than any other of the 19 banks tested.

270.    Beginning in May 2009, several members of the Board resigned, including lead independent director, O. Temple Sloan Jr., and Jackie Ward, chairman of the Board's asset quality committee. Other departures included Chief Risk Officer defendant Brinkley, and J. Chandler Martin, an enterprise credit and market risk executive.

271.    In June and July 2009, the Domestic Policy Subcommittee of the Oversight and Government Reform Committee of the House of Representatives held a series of hearings on the Merger, with a particular focus on defendant Lewis's failure to disclose either Merrill's mounting losses or his arrangement to receive a Government bailout.  During defendant Lewis's testimony on June 11, 2009, Representative Kucinich told Lewis that, "Our investigation, Mr. Lewis, also finds that Fed officials believe that you are potentially liable for violating securities laws by withholding material information in your possession from shareholders before the vote to approve the merger with Merrill Lynch on December 5th, 2008."  Representatives Welch and Cummings both repeatedly pressed Lewis on the lack of disclosure to shareholders.  As Representative Welch put it: "Did you tell your shareholders that you had come upon this information, that the deal they voted on is not the deal that was going through, because they had a $12 billion hole that was accelerating?"

272.    On August 3, 2009, the SEC filed a complaint against BOA in the United States District Court for the Southern District of New York, alleging that BOA had violated Section 14(a) of the Exchange Act by misleading shareholders about the Merrill bonus agreement. That same day, the SEC announced that BOA had agreed to settle the action and pay a *$33 million* fine, a pitifully small sum considering the damages Defendants caused.

273.    As the SEC charged in its complaint, although the Proxy had stated that Merrill would not pay year-end bonuses without BOA's consent, in fact, BOA had already consented to the payments as part of the Merger Agreement:

> The omission of Bank of America's agreement authorizing Merrill to pay discretionary year-end bonuses made the statements to the contrary in the joint proxy statement and its several subsequent amendments materially false and misleading. Bank of America's representations that Merrill was prohibited from making such payments were materially false and misleading because the contractual prohibition on such payments was nullified by the undisclosed contractual provision expressly permitting them.

274.    During the SEC's investigation, Merrill's most senior human resources executive, Peter Stingi ("Stingi"), whose responsibilities included monitoring the annual bonus pay of Merrill's competitors, acknowledged that the compensation expense set forth in Merrill's financial statements did not disclose Merrill's bonus plans. Specifically, Stingi testified under oath that:

> We would not be able to see what our competitors' quarterly [bonus] accruals were because they like us would report their compensation and benefits expense [as an aggregate] . . . . [Y]ou really couldn't make a very exact guess about what the impact on the annual bonus funding was because there are so many other line items that go into the aggregate expense.

275.    The day after the SEC filed its complaint, Representative Kucinich wrote to Mary Schapiro, Chair of the SEC, to "request that the SEC expand its investigation into possible securities law violations committed by Bank of America in connection with its merger with Merrill Lynch." Representative Kucinich explained that the House of Representatives' Domestic Policy Subcommittee of the Oversight and Government Reform Committee had "reviewed over 10,000 pages of confidential documents obtained from the Federal Reserve" and that "our investigation has revealed . . . [t]op staff at the Federal Reserve had concluded that Bank of America knew, as early as mid-November, about a sudden acceleration in the losses at Merrill Lynch, and [Federal Reserve] General Counsel Scott Alvarez believed that Bank of America could potentially be liable for securities laws violations for its failure to update its proxy solicitation and public statements it had made about the merger in light of information Bank of America possessed about Merrill's deterioration before the shareholder vote."

276.    On September 8, 2009, the New York Attorney General sent a letter to BOA's outside counsel, which summarized the results of the New York Attorney General's investigation and stated that it was in the process of "making charging decisions with respect to Bank of America and its executives." The letter provided that, "The facts of [Merrill's] cascading losses

and bonus payments – and the facts of Bank of America's senior executives' knowledge of these events – are straightforward."   The letter further provided that, "Our investigation has found at least four instances in the fourth quarter of 2008 where Bank of America and its senior officers failed to disclose material non-public information to its shareholders," and did so knowingly, including their failure to disclose: (i) at least "$14 billion" of Merrill's "losses prior to shareholder approval of the merger," about which "Bank of America knew"; (ii) "a goodwill charge of more than $2 billion associated with sub-prime related losses," which "was known of by November" 2008 but nevertheless lumped into Merrill's "purportedly 'surprising'" losses after the shareholder vote; (iii) Defendants' determination, "eight business days after the merger was approved, that they had a legal basis to terminate the merger because of Merrill's losses," which it reversed only "when the jobs of its officers and directors were threatened by senior federal regulators"; and (iv) Merrill's "accelerated bonus payments," which "were not disclosed in the proxy materials even though they clearly should have been under the circumstances."

277.   On September 14, 2009, the Honorable Jed S. Rakoff ("Judge Rakoff"), United States District Judge for the Southern District of New York, rejected the proposed $33 million settlement of the suit filed by the SEC against BOA.   Judge Rakoff held that the proposed settlement was "neither fair, nor reasonable, nor adequate" because no senior BOA executives were sued or contributed to the settlement.   Judge Rakoff found that the settlement violated the SEC's "normal policy in such situations [] to go after the company executives who were responsible for the lie," and rejected the SEC's contention that it did not have grounds for bringing claims against senior BOA officials, remarking, "How can such knowledge [of the falsity of the statements in the Proxy] be lacking when, as the Complaint in effect alleges, executives at the Bank expressly approved making year-end bonuses before they issued the

proxy statement denying such approval?"

278.    Following Judge Rakoff's rejection of the settlement, the SEC filed a second action on January 12, 2010, which asserted claims against BOA for violating Section 14(a) of the Exchange Act by failing to disclose Merrill's "extraordinary" fourth quarter 2008 financial losses. On February 4, 2010, BOA and the SEC jointly moved for approval of a Final Consent Judgment to resolve both of the SEC actions, submitting a Statement of Facts establishing that BOA's senior officers were aware of the bonus agreement and Merrill's losses. Significantly, BOA admitted, under Defendants' direction, that the SEC Statement of Facts has an evidentiary basis and agreed to pay a civil penalty of *$150 million* and to implement certain corporate governance reforms.

279.    On February 22, 2010, Judge Rakoff approved the proposed settlement of the SEC actions. In his Order approving the proposed settlement, Judge Rakoff noted that "it is clear to the Court" that:

> (1) the Proxy Statement that the Bank sent to its shareholders on November 3, 2008 soliciting their approval of the merger with Merrill Lynch & Co., Inc. ("Merrill") *failed adequately to disclose* the Bank's agreement to let Merrill pay its executives and certain other employees $5.8 billion in bonuses at a time when Merrill was suffering huge losses; and
>
> (2) *the Bank failed adequately to disclose* to its shareholders either prior to the shareholder approval of the merger on December 5, 2008 or prior to the merger's effective date of January 1, 2009 the Bank's ever-increasing knowledge that Merrill was suffering historically great losses during the fourth quarter of 2008 (ultimately amounting to a net loss of $15.3 billion, the largest quarterly loss in the firm's history) and that Merrill had nonetheless accelerated the payment to certain executives and other employees of more than $3.6 billion in bonuses.

280.    The Court further determined that these omissions were material, holding that, "it seems obvious that a prudent Bank shareholder, if informed of the aforementioned facts, would have thought twice about approving the merger or might have sought its renegotiation." The Court further found that, "based on careful review of voluminous materials," including an

extensive *ex parte* review of confidential deposition testimony provided by the New York Attorney General's office, BOA and its officers acted at least negligently in making these omissions, and specifically declined to make "any determination" of whether BOA and its officers acted intentionally because that issue was neither before the Court nor necessary to its decision. While the Court noted that "a reasonable regulator" could conclude that BOA and its officers acted negligently, the Court also found that the facts supported "plausible contrary inferences" of intentional misconduct.

281.     On September 18, 2009, the *Charlotte Observer* reported that, for the prior six months, the F.B.I. and the U.S. Department of Justice had been conducting an extensive "criminal investigation" of BOA in connection with the Merger. As part of this wide-ranging investigation, BOA "provided hundreds of thousands of documents and dozens of hours of executive time" to answer questions.

282.     That same day, *Bloomberg* reported that, on September 17, 2009, Thain gave a speech at the Wharton School of the University of Pennsylvania, during which he made clear that BOA's claim that it lacked control over the bonuses paid to Merrill executives and employees was not true:

> [W]hen [BOA] said, "John Thain secretly accelerated these bonuses," they were lying and that has now trapped them into a lot of trouble because there is a piece of paper, there's a document that says, yes, in fact they agreed to this in September. So one take away for all of you is it's really always better to just tell the truth.

283.     Then, on February 4, 2010, the New York Attorney General formally charged BOA, Lewis, and Price with four counts of securities fraud under New York's Martin Act, General Business Law §§ 352 and 353. Specifically, the New York Attorney General alleged that BOA, Lewis, and Price made a series of false and misleading statements and omissions concerning, among other things, Merrill's massive fourth quarter losses; BOA's agreement to

allow Merrill to pay billions in bonuses on an accelerated basis before the Merger closed, despite Merrill's financial performance; and the undisclosed $138 billion taxpayer bailout that BOA required in order to complete the Merger.  Defendants did not move to dismiss the New York Attorney General's complaint and, instead, answered the allegations on August 18, 2010.[15]

284.    Additionally, as a result of Defendants' actions regarding Merrill, BOA became the subject of the Securities Action.  Judge Castel held, *inter alia*, that the plaintiffs in the Securities Action sufficiently alleged:

a.    "with particularity that Merrill provided BOA with specific, contemporaneous data about its assets and their value while the transaction was pending;"

b.    "with particularity that BOA received ongoing updates on Merrill's finances and that Price was personally informed of Merrill's losses;"

c.    "recklessness as to Price, and satisfies the scienter requirement;"

d.    that it was plausible to infer that Price "engaged in 'conscious recklessness' amounting to 'an extreme departure from the standards of ordinary care'" concerning the Company's disclosures regarding Merrill; and

---

[15]    In addition to Defendants' problems with the Company's subprime exposure, the CW Acquisition, and the Merrill acquisition, Defendants have also caused the Company to become the subject of litigation brought by Federal Home Loan Banks, including (but not limited to): Atlanta, Chicago, and San Francisco (collectively, the "Federal Home Loan Bank Cases").  The Federal Home Loan Bank Cases generally raise, *inter alia*, claims regarding MBS based on allegations that Defendants issued false and misleading statements regarding the guidelines for extending mortgages to borrowers and the due diligence performed on repurchased and pooled loans.  Additionally, according to the Company's most recent Annual Report on Form 10-K filed with the SEC on February 23, 2012, the Company "has also received a number of subpoenas and other informal requests for information from federal regulators regarding MBS matters, including inquiries related to the Corporation's underwriting and issuance of MBS and its participation in certain CDO offerings."

e.   "by virtue of his position within BOA and his awareness of Merrill's losses, Lewis's inaction on the disclosure issue raises a strong inference of recklessness."

285.   In other words, Judge Castel determined that the Company, Lewis, and Price may have committed securities fraud.   Additionally, Judge Castel determined that defendants Bramble, Gifford, May, and Lozano may have violated the Securities Act.

286.   Most recently, on April 12, 2012, the parties to the Securities Action agreed to settle the shareholder derivative claims contained therein for $20 million.   The settlement of these derivative claims was clearly inadequate because, *inter alia*, it has been reported that damages may be in excess of *$5 billion* when taking into account all exposures to the Company as a result of the Merrill acquisition.   Further, the $20 million does not even cover the $150 million in fines to settle claims with the SEC related to the Merrill acquisition.   Plaintiff anticipates that he will file an objection to the settlement.

**G.   Certain Defendants Were Unjustly Enriched Based On Fictitious Financial Results Fueled by Risky Subprime Lending**

287.   Although BOA barely escaped the fate of some of its colleagues during the biggest economic meltdown since the Great Depression, the ill-effects of the above-described events will likely impair the Company and its stockholders for years.   Importantly, despite the fact that the Company will suffer for years to come, upon information and belief, no BOA employees were ever held directly responsible.

288.   On July 19, 2011, Defendants caused the Company to report a staggering *loss of $8.8 billion* for the second quarter of 2011 – *its largest loss ever*, as noted in the *Bloomberg Article*.   In commenting on these results, Moynihan admitted that massive subprime exposure was still plaguing the Company.   Specifically, Moynihan stated "[o]bviously, the solid

performance in our underlying businesses continued to be clouded by the costs we are absorbing from our legacy mortgage issues." Additionally, in the Company's Annual Report filed with the SEC on February 25, 2011, Defendants admitted that they were forced to increase the Company's "litigation expense" by a whopping *$1.6 billion* in 2010.

289. Fortunately for certain Defendants (and unfortunately for BOA stockholders), during the midst of Defendants' conduct that landed the Company in the terrible position it is in today, they reaped lucrative salaries and bonuses based on false and misleading financial results. In particular, between 2004 and 2007, Defendants caused BOA to report the following results:

|  | **2004** | **2005** | **2006** | **2007** |
|---|---|---|---|---|
| **Net Income** | $14.13B | $16.45B | $21.11B | $14.8B |
| **Earnings Per Share** | $3.49 | $4.11 | $4.74 | $3.33 |
| **Revenues** | $65.45B | $85.06B | $116.57B | $119.19B |
| **Gross Profit** | $36.27B | $52.78B | $76.77B | $74.21B |

290. Based entirely on these phony financial results, between 2004 and 2007, the following Defendants incredibly lucrative salaries and bonuses as detailed in the chart below:

| Name | Year | Salary ($) | Bonus ($)[16] | All Other Compensation ($) | Total Compensation ($) |
|---|---|---|---|---|---|
| Lewis | 2006 | 1,500,000 | 6,500,000 | 17,649,566 | 25,649,566 |
|  | 2005 | 1,500,000 | 5,650,000 | 14,877,984 | 22,027,984 |
|  | 2004 | 1,500,000 | 5,712,500 | 15,511,558 | 22,724,058 |
|  | 2003 | 1,500,000 | 5,375,000 | 13,342,987 | 20,217,987 |
| Molina | 2006 | 700,000 | 3,310,000 | 6,046,293 | 10,056,293 |
|  | 2005 | 700,000 | 3,050,000 | 4,973,985 | 8,723,985 |
|  | 2004 | 625,000 | 2,920,000 | 4,378,172 | 7,923,172 |
| Brinkley | 2006 | 800,000 | 3,450,000 | 6,574,323 | 10,824,323 |
|  | 2005 | 800,000 | 3,050,000 | 4,744,710 | 8,594,710 |

---

[16]     For 2006, "Bonus" is the "Non Equity Incentive Plan Compensation" as reported by Management in the Company's Proxy Statement filed with the SEC and disseminated to BOA stockholders on March 19, 2007.

| | 2004 | 800,000 | 2,725,000 | 4,713,829 | 8,238,829 |
| | 2003 | 800,000 | 2,595,000 | 4,468,704 | 7,863,704 |
| Desoer | 2006 | 800,000 | 3,575,000 | 6,804,663 | 11,179,663 |
| | 2005 | 791,667 | 2,985,000 | 4,792,001 | 8,568,668 |
| | 2004 | 691,667 | 2,725,000 | 4,367,638 | 7,784,305 |
| | 2003 | 645,833 | 2,595,000 | 4,282,265 | 7,523,098 |
| **TOTAL** | | | | | **187,900,345** |

291.    To date, the Board has taken no action to recoup any of these prior compensation awards.  In fact, the Board has taken no remedial action with respect to any of the issues identified herein.

## DERIVATIVE AND DEMAND ALLEGATIONS

292.    Plaintiff brings this action derivatively in the right and for the benefit of BOA to redress injuries suffered, and to be suffered, by BOA as a direct result of the breaches of fiduciary duty, abuse of control, and unjust enrichment, and gross mismanagement by Defendants.  BOA is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

293.    Plaintiff will adequately and fairly represent the interests of BOA in enforcing and prosecuting its rights, and has retained counsel experienced in litigating this type of action.

294.    Plaintiff is and was an owner of the stock of BOA during times relevant to Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

295.    In light of the foregoing events, on August 4, 2011, Plaintiff issued the Demand on the Board to commence an action against certain current and/or former directors and executive officers of the Company.  *See* Exhibit A.

296.    On January 19, 2012, the Board, through the Company's Associate General Counsel and Assistant Corporate Secretary, Bennett, sent an approximately one-page Refusal to

Plaintiff's counsel indicating that that the Board authorized the Audit Committee "to consider the Demand, undertake such steps as it determines to be advisable, and make recommendations to the Board with respect to the Demand." *See* Exhibit B.

297.    The Refusal likewise states that "[t]he Board considered the Demand at its January 11, 2012 meeting and determined, based on the recommendation of the Audit Committee of the Board, that it is not in the best interests of the Corporation to take this action or pursue the claims that [the Demand] appears to propose."

298.    The Refusal specifically states that "[b]ased on the recommendation of the Audit Committee, and in light of, among other things, the potential adverse effects and the legal and practical barriers to recovery, the Board has determined that the possibility of recovery by pursuing the claims outlined in [the Demand] is outweighed by the risk of weakening the Corporation's defenses in various pending proceedings and, accordingly, that it is not in the Corporation's interest to pursue such claims at this time."

299.    The Refusal contains *no information* whatsoever concerning what kind of investigation the Audit Committee engaged in, or what its substantive findings were regarding the merits of any of Plaintiff's claims as set forth in the Demand, despite the blanket statement that there are "legal and practical barriers to recovery."

300.    Clearly, the Board's complete disregard of the actual merits of the claims set forth in the Demand is improper and demonstrates the Board's lack of diligence and good faith.

301.    Thus, this shareholder derivative action should be allowed to proceed.

## COUNT I
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

302.    Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

303.   As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that BOA disseminated accurate, truthful and complete information to its shareholders.

304.   Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to BOA shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

305.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

306.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

307.   Defendants owed and owe BOA fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe BOA the highest obligation of good faith, fair dealing, loyalty and due care.

308.   Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

309.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, BOA has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

310.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

311.    Plaintiff, on behalf of BOA, has no adequate remedy at law.

## COUNT III
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

312.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

313.    As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

314.    Defendants willfully ignored the obvious and pervasive problems with BOA's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

315.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT IV
### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

316.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

317.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of BOA.

318.    Plaintiff, as a shareholder and representative of BOA, seeks restitution from these

Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V
## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

319.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

320.   Defendants had a duty to BOA and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of BOA.

321.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of BOA in a manner consistent with the duties imposed upon them by law.   By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of BOA's affairs and in the use and preservation of BOA's assets.

322.   During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused BOA to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to BOA, thus breaching their duties to the Company.   As a result, Defendants grossly mismanaged BOA.

## COUNT VI
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION IN CONNECTION WITH THE CW ACQUISITION

323.   Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

324.   As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that BOA disseminated accurate, truthful and complete information to its shareholders concerning the CW Acquisition.

325.   Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to BOA shareholders materially misleading and inaccurate information regarding the effects of the highly risky CW Acquisition on BOA through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

326.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**COUNT VII**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR
FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY IN
CONNECTION WITH THE CW ACQUISITION**

327.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

328.   Defendants owed and owe BOA fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe BOA the highest obligation of good faith, fair dealing, loyalty and due care.

329.   Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision in connection with their, *inter alia,* failure to conduct a proper and thorough due diligence investigation of Countrywide's core business operations prior to the CW Acquisition.

330.   As a direct and proximate result of Defendants' failure to perform their fiduciary

obligations, BOA has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

331.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

332.    Plaintiff, on behalf of BOA, has no adequate remedy at law.

## COUNT VIII
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS IN CONNECTION WITH THE CW ACQUISITION

333.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

334.    As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

335.    Defendants willfully ignored the obvious and pervasive problems with BOA's internal controls and practices and procedures in connection with the risks associated with the CW Acquisition and failed to make a good faith effort to correct these problems or prevent their recurrence.

336.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT IX
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION IN CONNECTION WITH THE MERRILL MERGER

337.    Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

338.   As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that BOA disseminated accurate, truthful and complete information to its shareholders concerning the CW Acquisition.

339.   Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to BOA shareholders materially misleading and inaccurate information regarding the effects of the highly risky Merger on BOA through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

340.   As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT X
## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY IN CONNECTION WITH THE MERRILL MERGER

341.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

342.   Defendants owed and owe BOA fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe BOA the highest obligation of good faith, fair dealing, loyalty and due care.

343.   Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision in connection with their, *inter alia,* failure to conduct a proper and thorough due diligence investigation of Merrill's core business operations prior to the Merger.

344.   As a direct and proximate result of Defendants' failure to perform their fiduciary

115

obligations, BOA has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

345.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

346.    Plaintiff, on behalf of BOA, has no adequate remedy at law.

## COUNT XI
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS IN CONNECTION WITH THE MERRILL MERGER

347.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

348.    As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

349.    Defendants willfully ignored the obvious and pervasive problems with BOA's internal controls and practices and procedures in connection with the risks associated with the Merger and failed to make a good faith effort to correct these problems or prevent their recurrence.

350.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing BOA to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to BOA restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 19, 2012                **HARWOOD FEFFER LLP**

By: _____

Robert I. Harwood
Daniella Quitt
488 Madison Ave., 8th Floor
New York, NY 10022
Telephone (212) 935-7400
Facsimile: (212) 753-3630

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto
Joseph M. Profy
David M. Promisloff
22 Cassatt Avenue
First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8206

**LAW OFFICE OF DEBRA S. GOODMAN, P.C.**
Debra S. Goodman
1301 Skippack Pike, Suite 7A, #133
Blue Bell, PA 19422
Telephone: (610) 277-6057

Counsel for Plaintiff

## <u>BANK OF AMERICA CORPORATION VERIFICATION</u>

I, Matthew Pinsly, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 6/17/12

Matthew Pinsly